# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

ASSOCIATION OF COMMUNITY
CANCER CENTERS, *et al.*,

          Plaintiffs,

   v.

ALEX M. AZAR, II, *et al.*,

          Defendants.

REDACTED

Civil Action No. 1:20-CV-3531

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................................1

BACKGROUND ......................................................................................................................2

I.  The Center for Medicare and Medicaid Innovation .......................................................2

II.  Medicare and the Most Favored National Model Interim Final Rule ...........................3

III.  This Litigation ...............................................................................................................6

LEGAL STANDARD ..............................................................................................................6

ARGUMENT ............................................................................................................................7

I.  PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR
    CLAIMS. .......................................................................................................................7

    A.  Plaintiffs' Claims are Barred from Judicial Review.............................................7

        i.  The Medicare Statute Withdraws Jurisdiction Over Plaintiffs' Claims
            Because They Failed to Present a Claim for Reimbursement. .........................7

        ii.  Congress Barred Judicial Review of Decisions Related to the Center's
            Discretion.......................................................................................................9

    B.  Plaintiffs' Substantive Claims are Without Merit...........................................13

        i.  CMS Properly Waived Notice and Comment for Good Cause under
            the APA and the Medicare Statute. ..............................................................13

        ii.  CMS Promulgated the MFN Model within its Statutory Authority. ..............17

        iii.  Section 1315a satisfies the constitutional requirement of presentment.........21

        iv.  Section 1315a does not violate the non-delegation doctrine..........................23

II.  PLAINTIFFS HAVE FAILED TO ESTABLISH THE REQUISITE SHOWING
    OF IRREPARABLE HARM. ......................................................................................26

    A.  Plaintiffs Are Not Entitled to a Temporary Restraining Order Based on the
        Risk of Irreparable Injury to Third Parties. ....................................................26

    B.  Plaintiffs Have Not Demonstrated That Health Care Providers Will
        Experience Considerable Economic Harm In the Absence of Preliminary
        Relief.................................................................................................................28

C.     Plaintiffs Have Not Shown That Pharmaceutical Manufacturers Will Experience Immediate, Non-Speculative Harm In the Absence of Preliminary Relief. ...............................................................................................30

D.     Plaintiffs Have Not Shown Irreparable Harm Based on a Lack of Advance Notice and Comment..............................................................................................32

E.     Plaintiffs Have Not Demonstrated Irreparable Harm Based On A Constitutional Injury. ..........................................................................................33

III.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST THE REQUESTED INJUNCTION........................................................34

IV.    ANY INJUNCTIVE RELIEF SHOULD BE LIMITED TO THE PLAINTIFFS.............34

CONCLUSION...............................................................................................................35

# TABLE OF AUTHORITIES

## CASES

*A.L.A. Schechter Poultry Corp. v. United States*,
  295 U.S. 495 (1935) ..................................................................................................23

*Adventist Healthcare, Inc. v. Sebelius*,
  2010 WL 3038917 (D. Md. July 30, 2010) ..............................................................30

*Am. Chiropractic Ass'n, Inc. v. Leavitt*,
  431 F.3d 812 (D.C. Cir. 2005) .....................................................................................8

*Am. Petroleum Inst. v. Jorling*,
  710 F. Supp. 421 (N.D.N.Y. 1989) ............................................................................33

*Am. Power & Light Co. v. SEC*,
  329 U.S. 90 (1946) ....................................................................................................24

*Amgen, Inc. v. Smith*,
  357 F.3d 103 (D.C. Cir. 2004) ...................................................................................11

*Ariz. Hosp. & Healthcare Ass'n v. Betlach*,
  865 F. Supp. 2d 984 (D. Ariz. 2012) .........................................................................31

*Bailey v. Atl. Auto. Grp.*,
  992 F. Supp. 2d 560 (D. Md. 2014) ...........................................................................26

*Bd. of Governors of Fed. Reserve System v. MCorp*,
  502 U.S. 32 (1991) ................................................................................................9, 10

*Cal Pharmacists Ass'n v. Maxwell-Jolly*,
  596 F.3d 1098 (9th Cir. 2010), *vacated & remanded sub nom.*,
  *Douglas v. Indep. Living Ctr. of S. Cal. Inc.*, 565 U.S. 606 (2012) ........................29

*California v. Azar*,
  911 F.3d 558 (9th Cir. 2018) .....................................................................................35

*Chamber of Commerce of the United States v. DHS*,
  2020 WL 7043877 (N.D. Cal. Dec. 1, 2020) ............................................................16

*Chevron, U.S.A, Inc. v. Nat. Res. Def. Council*,
  467 U.S. 837 (1984) ..................................................................................................18

*Children's Hosp. of the King's Daughters, Inc. v. Price*,
  258 F. Supp. 3d 672 (E.D. Va. 2017) .............................................................28, 29, 30

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ..............................................................................................21, 23

*Coalition for Parity, Inc. v. Sebelius,*
709 F. Supp. 2d 10 (D.D.C. 2010) ...................................................................16

*ConverDyn v. Moniz,*
68 F. Supp. 3d 34 (D.D.C. 2014) ...................................................... 28, 29, 30, 31

*Cornish v. Dudas,*
540 F. Supp. 2d 61 (D.D.C. 2008) ...................................................................34

*Council for Urological Interests v. Sebelius,*
668 F.3d 704 (D.C. Cir. 2011) ...........................................................................8

*Cumberland Cty. Hosp. System, Inc. v. Burwell,*
816 F.3d 48 (4th Cir. 2016) ...............................................................................7

*Cuozzo Speed Technologies, LLC v. Lee,*
136 S. Ct. 2131 (2016) .......................................................................................9

*DCH Reg. Med. Ctr. v. Azar,*
925 F.3d 503 (D.C. Cir. 2019) ............................................................... 9, 10, 11

*Defs. of Wildlife v. Chertoff,*
527 F. Supp. 2d 119 (D.D.C. 2007) .................................................................22

*Dep't of Homeland Security v. New York,*
140 S. Ct. 599 (2020) .......................................................................................35

*Direx Israel, Ltd. v. Breakthrough Med. Corp.,*
852 F.2d 802 (4th Cir. 1991) .............................................................................6

*Direx Israel, Ltd. v. Breakthrough Med. Corp.,*
952 F.2d 802 (4th Cir. 1991) ...........................................................................30

*Duncan v. West,*
153 F.3d 719 (4th Cir. 1998) ...........................................................................10

*Feinerman v. Bernardi,*
558 F. Supp. 2d 36 (D.D.C. 2008) ...................................................................28

*Field v. Clark,*
143 U.S. 649 (1892) .........................................................................................21

*Fla. Health Sci. Ctr. v. Sec'y of Health and Human Servs.,*
830 F.3d 515 (D.D.C. 2016)..............................................................................10

*Gill v. Whitford,*
138 S. Ct. 1916 (2018).......................................................................................34

iv

*Gundy v. United States*,
139 S. Ct. 2116 (2019) ........................................................................ 23, 24, 25

*Hanauer v. Reich*,
82 F.3d 1304 (4th Cir. 1996) .................................................................. 10, 11

*Heckler v. Ringer*,
466 U.S. 602 (1984) ............................................................................... 7, 12, 13

*Hegab v. Long*,
716 F.3d 790 (4th Cir. 2013) ......................................................................... 12

*Hellon & Assocs., Inc. v. Phoenix Resort Corp.*,
958 F.2d 295 (9th Cir. 1992) ......................................................................... 23

*In re Microsoft Corp. Antitrust Litig.*,
333 F.3d 517 (4th Cir. 2003) ......................................................................... 34

*J. W. Hampton, Jr., & Co. v. United States*,
276 U.S. 394 (1928) ....................................................................................... 24

*June Med. Servs. LLC v. Russo*,
140 S. Ct. 2103 (2020) ................................................................................... 27

*Kowalski v. Tesmer*,
543 U.S. 125 (2004) ....................................................................................... 27

*Lawrence & Mem'l Hosp. v. Sebelius*,
986 F. Supp. 2d 124 (D. Conn. 2013) ........................................................... 28

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
979 F.3d 219 (4th Cir. 2020) ........................................................................... 7

*Long Term Care Partners LLC v. US*,
516 F.3d 225 (4th Cir. 2008) ......................................................................... 10

*MacKenzie Med. Supply v. Leavitt*,
506 F.3d 341 (4th Cir. 2007) ......................................................................... 18

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994) ....................................................................................... 34

*Mayor & City Council of Baltimore v. Azar*,
392 F. Supp. 3d 602 (D. Md. 2019) ......................................................... 26, 30

*MicroStrategy, Inc. v. Motorola, Inc.*,
245 F.3d 335 (4th Cir. 2001) ........................................................................... 6

*Mistretta v. United States,*
    488 U.S. 361 (1989) ................................................................................................ 23, 24

*Mountain Valley Pipeline, LLC v. W. Pocahontas Properties Ltd. P'ship,*
    918 F.3d 353 (4th Cir. 2019) ............................................................................................28

*N. Mariana Islands v. U.S.,*
    686 F. Supp. 2d 7 (D.D.C. 2009) .....................................................................................33

*N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health,*
    545 F. Supp. 2d 363 (S.D.N.Y. 2008), *rev'd on other grounds*, 556 F.3d 114 (2d Cir. 2009) ................33

*Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.,*
    894 F.3d 95 (D.C. Cir. 2018) ...........................................................................................15

*Nat'l Venture Capital Ass'n v. Duke,*
    291 F. Supp. 3d 5 (D.D.C. 2017) .....................................................................................15

*Nat'l Women, Infants, & Children Grocers Ass'n v. Food & Nutrition Serv.,*
    416 F. Supp. 2d 92 (D.D.C. 2006) ...................................................................................14

*National Athletic Trainers' Association, Inc. v. U.S. Department of Health & Human Services,*
    455 F.3d 500 (5th Cir. 2006) .............................................................................................8

*Ne. Hosp. Corp. v. Sebelius,*
    657 F.3d 1 (D.C. Cir. 2011) ...............................................................................................3

*Nken v. Holder,*
    556 U.S. 418 (2009) ....................................................................................................7, 34

*Nyunt v. Chairman, Broadcasting Bd. of Governors,*
    589 F.3d 445 (D.C. Cir. 2009) .........................................................................................11

*Otsuka Pharm. Co. v. Burwell,*
    2015 WL 1962240 (D. Md. Apr. 29, 2015) .....................................................................28

*Panama Refining Co. v. Ryan,*
    293 U.S. 388 (1935) .........................................................................................................23

*Pashby v. Delia,*
    709 F.3d 307 (4th Cir. 2013) ...........................................................................................26

*Paskowitz v. Arnall,*
    2019 WL 3841999 (W.D.N.C. Aug. 15, 2019) ...............................................................31

*Philip Morris USA Inc. v. Scott,*
    561 U.S. 1301 (2010) .......................................................................................................28

*Physician Hosps. of Am. v. Sebelius,*
  691 F.3d 649 (5th Cir. 2012) ......................................................................8

*Pub. Serv. Co. of N.H. v. Town of W. Newbury,*
  835 F.2d 380 (1st Cir. 1987)......................................................................33

*Republic of Iraq v. Beaty,*
  556 U.S. 848 (2009) .................................................................................22

*Richmond Med. Ctr. for Women v. Gilmore,*
  11 F. Supp. 2d 795 (E.D. Va. 1998)...........................................................27

*Ross v. Meese,*
  818 F.2d 1132 (4th Cir. 1987)...................................................................33

*Seaside Civic League, Inc. v. U.S. Dep't of Housing & Urban Dev.,*
  2014 WL 2192052 (N.D. Cal. 2014) ..........................................................34

*Shalala v. Illinois Council on Long Term Care, Inc.,*
  529 U.S. 1  (2000) ...................................................................7, 8, 12, 13

*Singleton v. Wulff,*
  428 U.S. 106 (1976) .................................................................................27

*Sociedad Anonima Viña Santa Rita v. U.S. Dep't of Treasury,*
  193 F. Supp. 2d 6 (D.D.C. 2001) ...............................................................28

*Sorenson Comm'n, Inc. v. FCC,*
  755 F.3d 702 (D.C. Cir. 2014) ..................................................................14

*Starnes v. Schweiker,*
  748 F.2d 217 (1984).................................................................................13

*Sw. Pharm. Sols., Inc. v. CMS,*
  718 F.3d 436 (5th Cir. 2013) ......................................................................8

*Synopsys, Inc. v. Matal,*
  280 F. Supp. 3d 823 (E.D. Va. 2017)..........................................................11

*Three Lower Counties Community Health Servs., Inc. v. U.S. Dep't of Health & Human Servs.,*
  317 Fed. Appx. 1 (D.C. Cir. 2009) ...............................................................7

*Trump v. Hawaii,*
  138 S. Ct. 2392 (2018)..............................................................................34

*Tyler v. Cain,*
  533 U.S. 656 (2001) .................................................................................18

*United States v. Dean,*
  604 F.3d 1275 (11th Cir. 2010)...........................................................................14

*Wayman v. Southard,*
  23 U.S. (10 Wheat.) 1 (1825)............................................................................24

*Webster v. Doe,*
  486 U.S. 592 (1988) ............................................................................................11

*Weinberger v. Salfi,*
  422 U.S. 749 (1975) ..............................................................................................8

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001) ............................................................................................23

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ....................................................................................6, 7, 26

*Wynn v. Chanos,*
  75 F. Supp. 3d 1228 (N.D. Cal. 2014) .............................................................31

*Zayeer v. Sturm Foods, Inc.,*
  896 F. Supp. 2d 399 (D. Md. 2012) .................................................................27

*Zhang v. Slattery,*
  55 F.3d 732 (2d. Cir. 1995).................................................................................16

## STATUTES

5 U.S.C. § 553 ...........................................................................................12, 13, 14

28 U.S.C. § 1331..............................................................................................12

42 U.S.C. § 405...........................................................................................7, 8

42 U.S.C. § 1395 *et seq.*..............................................................................3

42 U.S.C. § 1315a....................................................................................*passim*

42 U.S.C. § 1395b-1 .......................................................................................22

42 U.S.C. § 1395cc-3.......................................................................................22

42 U.S.C. § 1395cc-4.......................................................................................22

42 U.S.C. § 1395cc-5.......................................................................................22

42 U.S.C. § 1395cc-6.......................................................................................22

42 U.S.C. § 1395hh ........................................................................................13

42 U.S.C. § 1395ff ....................................................................................................7

42 U.S.C. § 1395j .....................................................................................................3

42 U.S.C. § 1395jjj ..................................................................................................22

42 U.S.C. § 1395w-3a ........................................................................................ 3, 22

42 U.S.C. § 1395w-4 ................................................................................................3

42 U.S.C. § 1871 .....................................................................................................13

## REGULATIONS

42 C.F.R. § 405.904 ..................................................................................................7

42 C.F.R. § 513.210 ................................................................................................30

Most Favored Nation (MFN) Model,
  85 Fed. Reg. 76180 (Nov. 27, 2020) ...........................................................*passim*

## U.S. CONSTITUION

U.S. Const. art. I, § 7 ..............................................................................................21

## OTHER AUTHORITIES

COVID–19 Forecasts: Cases,
  https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/forecasts-cases.html) ....................15

https://www.cms.gov/index.php/medicare/medicare-part-b-drug-average-sales-price/2021-asp-
  drug-pricing-files....................................................................................................22

11A Charles Alan Wright & Arthur P. Miller, *Federal Practice & Procedure* § 2948.1 (3d ed.)…...    33

# INTRODUCTION

Medicare Part B costs are skyrocketing, particularly with respect to certain drugs, hitting the public fisc and the wallets of vulnerable seniors hard. The financial impact on seniors has been compounded by the COVID-19 pandemic, at a time when chronic disease management is most important, and giving rise to a particularly urgent need to provide relief in light of the new wave of COVID-19 infections sweeping the nation. At the same time, the United States pays significantly more for prescription drugs than all other developed countries, resulting in an unfair burden on Medicare beneficiaries in the United States and on American taxpayers. In response, the Centers for Medicare & Medicaid Services ("CMS") exercised its statutory authority to promulgate a cost-saving payment model for the approximately 50 Medicare Part B drugs representing the highest proportion of overall spending based on the costs of those drugs in other countries, titled the Most Favored Nation Model ("the Rule"). The Rule is predicted to result in billions of dollars in savings.

Plaintiffs, a group of healthcare provider advocacy organizations and drug manufacturing lobbyists, now seek a temporary restraining order to invalidate the Rule on a number of procedural and substantive grounds. At the threshold, the Court lacks jurisdiction to consider Plaintiffs' claims for two reasons. First, Plaintiffs have not presented a claim for reimbursement to the Secretary, without which the Medicare statute bars the Court from considering any claim arising under the statute. Second, the Medicare statute explicitly bars judicial review of the "selection and design of" Medicare models such as the one challenged here.

In any event, Plaintiffs' substantive claims are without merit. CMS complied with the Administrative Procedure Act in promulgating the Rule, and the Rule is a valid and constitutional exercise of CMS's statutory authority. Moreover, Plaintiffs are not irreparably harmed, and have not satisfied the demanding standard for issuance of a temporary restraining order. Plaintiffs cannot rely on purported harm to patients who are not parties to this lawsuit to justify a TRO. Instead, Plaintiffs must demonstrate irreparable harm to themselves or to their members. However, Plaintiffs have not shown that the anticipated harm to healthcare providers or pharmaceutical companies are significant or imminent enough to warrant preliminary relief. Nor can Plaintiffs rely on claims of procedural or

constitutional injuries to sustain an injunction in the absence of concrete irreparable harm.

For these reasons, the Court should deny Plaintiffs' motion.

## BACKGROUND

### I.   The Center for Medicare and Medicaid Innovation

When Congress enacted the Patient Protection and Affordable Care Act of 2010 ("ACA"), it also created the Center for Medicare and Medicaid Innovation ("the Center"). The Center exists to "test innovative payment and service delivery models" with the goal of "reduc[ing] program expenditures" while maintaining, or even improving, "quality of care." 42 U.S.C. § 1315a(a)(1).

The Secretary has wide discretion to select models for testing. In selecting a model for Phase testing, the Secretary of the Department of Health and Human Services need only determine that the model "addresses a defined population" for which there are either: (1) "deficits in care leading to poor clinical outcomes;" or (2) "potentially avoidable expenditures." *Id.* § 1315a(b)(2)(A). Congress directed the Secretary to "focus" on "models expected to reduce program costs" while also "preserving or enhancing the quality of care." *Id.* The statute provides a list of illustrative examples, such as, "[p]romoting broad payment and practice reform in primary care," *id.* § 1315a(b)(2)(B)(i), and "[v]arying payment to physicians who order advanced diagnostic imaging services" based on certain criteria, *id.* § 1315a(b)(2)(B)(vi). And, while the Secretary "may elect to limit testing of a model to certain geographic areas," there is no requirement to do so. *Id.* § 1315a(a)(5).

The Secretary is also directed to "terminate or modify" the model after testing has begun unless it is expected to: (1) "improve the quality of care . . . without increasing spending;" (2) "reduce spending . . . without reducing the quality of care;" or (3) improve the quality of care and reduce spending." *Id.* § 1315a(b)(3)(B). The Secretary is also required to evaluate each model tested and make the results of the evaluation available to the public. *Id.* § 1315a(b)(4)(A)-(B). After taking into account the evaluation of a Phase I test, the Secretary "may, through rulemaking, expand . . .the duration and the scope of a model" to Phase II if the Secretary determines that the goals of the statute are satisfied. *Id.* § 1315a(c).

Implicitly recognizing the difficulties in innovating new models, Congress sought to give the Center significant flexibility to do so. Congress gave the Secretary authority to waive certain otherwise applicable requirements "for the purposes of carrying out this section with respect to testing models." *Id.* § 1315ad(1). Congress also barred judicial review of the Secretary's decisions, stating that "[t]here shall be no administrative or judicial review" of, among other things: (1) "the selection of models for testing or expansion under this section;" (2) "the selection of organizations, sites, or participants to test those models selected;" and (3) "the elements, parameters, scope, and duration of such models for testing or dissemination." *Id.* § 1315a(d)(2).

## II. Medicare and the Most Favored National Model Interim Final Rule

Medicare is a federal health insurance program for the elderly and disabled, *see* 42 U.S.C. § 1395 *et seq.*, which is administered on behalf of the Secretary by the CMS. Part A of the Medicare statute "covers medical services furnished by hospitals and other institutional care providers." *Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 2 (D.C. Cir. 2011) (citation omitted). Medicare Part B "is an optional supplemental insurance program that pays for medical items and services not covered by Part A, including outpatient physician services," as well as "clinical laboratory tests, and durable medical equipment," among other things, *Ne. Hosp.*, 657 F.3d at 2 (citing 42 U.S.C. §§ 1395j to 1395w-4).

On November 27, 2020, CMS issued the interim final rule, "Most Favored Nation (MFN) Model" ("the Rule"), 85 Fed. Reg. 76180. The Rule responds to "[i]ncreases in drug prices" that have been "accelerating at a rate that significantly outpaces the growth in spending on other Medicare Part B services" and the fact that these prices. "far exceed prices in other countries." 85 Fed. Reg. 76,180.

Currently, the price of Medicare Part B drugs is set using the statutory methodology set forth in 42 U.S.C. § 1395w-3a. Most of the time, this "means payment is based on the Average Sales Price (ASP) plus a statutorily mandated 6 percent add-on." 85 Fed. Reg. 76180. Because the ASP "is calculated using only the prices that manufacturers charge to certain U.S.-based purchasers," CMS found that "the Medicare program does not get the benefit of the substantial discounts provided in other countries." *Id.* at 76180-81. And because the dollar amount of the add-on is higher for drugs with higher ASPs, CMS concluded, "ASP-based payments may encourage the use of more expensive

drugs." *Id.* at 76181. This translates to higher costs for beneficiaries as well, as "beneficiaries' cost-sharing is generally 20 percent of the Medicare-allowed amount." *Id.* at 76182.

To address these concerns, CMS used its authority under § 1315a to create the Most Favored Nation Model ("MFN Model"). The MFN Model will reduce the cost of Medicare Part B spending by the Government and by beneficiaries in two ways: (1) by "calculate[ing] the payment amount for MFN Model drugs based on a price that reflects the lowest per capital Gross Domestic Product-adjusted . . . price of any non-U.S. member country of the Organisation for Economic Co-operation and Development . . . with a [Gross Domestic Product] that is at least sixty percent of the U.S. [Gross Domestic Product]- per capita;" and (2) by "mak[ing] an alternative add-on payment for MFN Model drugs that will remove or reduce the financial incentive to prescribe higher-cost drugs more frequently." *Id.* at 76181. CMS estimates that this model will result in more than $80 billion in savings for the Government and $28.5 billion for Medicare beneficiaries over a seven-year period. *Id.*

The MFN Model will include approximately 50 drugs that have the "highest aggregated Medicare Part B total allowed charges in the baseline period…," *id.* at 76189. CMS determined that, "[c]ompared to beginning with a smaller number of drugs and phasing in additional drugs in each subsequent performance year, beginning with 50 Medicare Part B drugs simplifies the model design and reduces complexity for MFN participants." *Id.* CMS defined the population for this model as the beneficiaries who receive one or more of these drugs from a MFN Model participant, reasoning that this "allows the MFN Model payment to apply to a broad set of conditions, drugs, medical specialties, clinical settings, and localities rather than having MFN Model payment focused on a particular clinical presentation, course of treatment, or single type of care setting." *Id.* at 76183.

The MFN Model requires mandatory participation because "[m]andatory participation can enhance generalizability of model results, as mandatory model participants may be more broadly representative of all entity types that could be affected by a model." *See id.* at 76187. CMS explained that it was important for the MFN Model to be tested on a nationwide scale for four reasons: (1) to avoid "administrative burden" on providers with locations across the country; (2) to "eliminate the potential" for multi-location providers to influence where beneficiaries seek treatment; (3) to

4

"maintain[] continuity with current treatment patterns;" and (4) to "allow[] all eligible beneficiaries" to "benefit from the cost-sharing reductions." *Id.* at 76187-88.

Though CMS is testing the MFN Model over seven years, it is phasing in the new pricing structure 25 percent per year over the first three years, only reaching 100 percent of the new price for the last four years of the model. *Id.* at 76205. This phase-in approach allows time for participants "to adjust to the model payment amounts and processes." *Id.* at 76204. Thus, in the first year, participants will be reimbursed 75% of the ASP, and only 25% of the MFN Price. *Id.* at 76205.

CMS found good cause to waive notice and comment requirements "because of the particularly acute need for affordable Medicare Part B drugs now, in the midst of the COVID-19 pandemic." *Id.* at 76249. CMS noted that the high costs of drugs in the U.S. has "serious economic and health consequences for beneficiaries in need," causing them to "divert scarce resources to pharmaceutical treatments and away from other needs" or even to "skip doses of their medications" or "abandon treatment." *Id.* Particularly with over 25 million Medicare beneficiaries living at or below 200 percent of the Federal Poverty Line, CMS concluded that high drug prices could result in "poor clinical outcomes for chronic disease management." *Id.*

CMS explained that the COVID-19 pandemic has exacerbated these concerns. As CMS noted in the Rule, the unemployment rate and number of unemployed persons remain at nearly twice the pre-pandemic levels. *Id.* The pandemic has "also led to an increase in food prices, straining budgets for many of America's seniors, particularly those who live on fixed incomes, such as the 6 million Medicare fee-for-service beneficiaries without supplemental coverage and over 12 million beneficiaries dually eligible for Medicare and Medicaid." *Id.* Accordingly, CMS determined that "the burdens placed on America's seniors and other Medicare Part B beneficiaries" have "given rise to an urgent need for swift action to reduce drug prices." *Id.* In particular, CMS noted that, after "some positive economic and employment trends since the initial peak in April," there is a "new surge in COVID-19 cases that may lead to additional hardship and requires immediate action." *Id.* CMS expects that the implementation of the Rule will "provide immediate relief to Medicare beneficiaries through reduced copays for MFN drugs due to lower drug payments and no beneficiary cost-sharing on the alternative

add-on payment." *Id.*  For the same reasons, CMS also found good cause to waive the requirements for a delay in effective date under the APA and 42 U.S.C. § 1871(e)(1)(B).  *Id.*

## III.   This Litigation

Plaintiffs filed their Complaint on December 4, 2020, raising five claims challenging the Rule. *See* Complaint, ECF No. 1 ("Compl.").  First, Plaintiffs allege that Defendants issued the Rule in violation of the Administrative Procedure Act's ("APA") notice and comment procedures under 5 U.S.C. § 553 and the notice and comment provisions of the Medicare statute. *Id.* ¶¶ 146-150.  Next, Plaintiffs allege that the Rule is contrary to law and *ultra vires* because it exceeds Defendants' statutory authority under 42 U.S.C. § 1315a. *Id.* ¶¶ 151-156.  Plaintiffs also allege that the Rule was issued in violation of the U.S. Constitution's Presentment Clause and the nondelegation doctrine. *Id.* ¶¶ 157-170.  Finally, Plaintiffs allege that the Rule is contrary to law because it is the product of an unauthorized presidential directive. *Id.* ¶¶ 171-175.[1]  In addition to declaratory relief, Plaintiffs ask the Court to set aside and vacate the Rule, and to "[i]ssue preliminary and permanent injunctive relief, including a temporary restraining order, without bond, preventing Defendants from implementing or enforcing the MFN Rule, or requiring them to complete notice-and-comment rulemaking before putting any such rule into effect." *Id.*, Prayer for Relief.  Approximately one week after their Complaint was filed, on December 10, 2020, Plaintiffs moved for a preliminary injunction and temporary restraining order.  Mem. in Supp. for a Temp. Restraining Order and Prelim. Inj., ECF No. 24-1 ("Pls.' Mot.").  The Court held a scheduling conference on December 11, 2020, and subsequently ordered the Government to respond to Plaintiffs' motion for a temporary restraining order on December 15, 2020.  Mem. To Counsel, ECF No. 31.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary" remedy "involving the exercise of a very far-reaching power to be granted only sparingly and in limited circumstances."  *See MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*,

---

[1] Plaintiffs do not move for emergency relief on this claim.

852 F.2d 802, 816 (4th Cir. 1991); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiffs seeking a preliminary injunction "must make a 'clear showing' that they satisfy four independent requirements." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 979 F.3d 219, 226 (4th Cir. 2020) (citing *Winter*, 555 U.S. at 22). Plaintiffs must demonstrate that (1) they are "likely to succeed on the merits," (2) that they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) that "the balance of equities tip[s] in [their] favor," and (4) that "an injunction is in the public interest." *Winter*, 555 U.S. at 20. The final two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

## I. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

### A. Plaintiffs' Claims are Barred from Judicial Review.

#### i. The Medicare Statute Withdraws Jurisdiction Over Plaintiffs' Claims Because They Failed to Present a Claim for Reimbursement.

District courts may exercise jurisdiction over claims arising under the Medicare statute only if the claimant obtains a "final decision" from the Secretary. 42 U.S.C. §§ 405(g), 1395ff(b); *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 5, 15 (2000). Ordinarily a final decision comprises two basic components: (1) presentment of a "concrete claim for reimbursement" to HHS (and the receipt of an initial determination), *Heckler v. Ringer*, 466 U.S. 602, 622 (1984), and (2) exhaustion of administrative appeals, 42 U.S.C. § 1395ff; 42 C.F.R. § 405.904(a)(2); *see also Cumberland Cty. Hosp. System, Inc. v. Burwell*, 816 F.3d 48, 54 (4th Cir. 2016) ("[A] healthcare provider must present the claim in the first instance . . . and thereafter engage the process of review and appeal . . . ."). No party may waive the presentment requirement, *Ill. Council*, 529 U.S. at 15, and it applies to Plaintiffs' procedural, statutory, and constitutional claims with equal force. *See Ringer*, 466 U.S. at 614 (holding that Secretary's "alleged failure to comply with the rulemaking requirements of the APA" was "inextricably intertwined" with their underlying claim, and thus barred from judicial review); *Three Lower Counties Community Health Servs., Inc. v. U.S. Dep't of Health and Human Servs.*, 317 Fed. Appx. 1, 2 (D.C. Cir. 2009) ("Parties challenging Medicare rules must exhaust the agency review process regardless of

whether the matter involves a direct constitutional, statutory, or regulatory challenge.").

Here, Plaintiffs challenge an agency action taken under 42 U.S.C. § 1315a, indisputably part of the Medicare statute, as the action is a model test specific to Part B of the Medicare statute. *See Weinberger v. Salfi*, 422 U.S. 749, 761-62 (1975) (finding that case arises under the Act when the Act "provides both the standing and the substantive basis for the present contentions"). Yet, Plaintiffs have not presented a claim for reimbursement. Nor could they, as the MFN Model does not take effect until January 1, 2020. *See* 85 Fed. Reg. 76181. Thus, the Court's jurisdiction is barred by 42 U.S.C. §§ 405(h), (g).

That only patients and their representatives, along with healthcare providers, can submit claims for reimbursement does not mean that the non-provider plaintiffs in this case may escape the jurisdictional bar. *See Council for Urological Interests v. Sebelius*, 668 F.3d 704, 711 (D.C. Cir. 2011). In *National Athletic Trainers' Association, Inc. v. U.S. Department of Health and Human Services*, for example, the Fifth Circuit rejected an attempt by a group of athletic trainers to invoke the *Illinois Council* exception even though the trainers, "because they [were] neither beneficiaries nor providers," could not "obtain administrative review" of a new Medicare regulation. 455 F.3d 500, 504 (5th Cir. 2006). The court held that the *Illinois Council* exception was unavailable where "a third party can assert the claim." *Id.* In that case, because physicians had "sufficient incentive to challenge the rule" and could "pursue administrative review" of individual claims, the court held that it "lacked subject matter jurisdiction over [the trainers'] claim." *Id.* at 504, 507–08; *see also, e.g., Sw. Pharm. Sols., Inc. v. CMS*, 718 F.3d 436, 444–46 (5th Cir. 2013); *Am. Chiropractic Ass'n, Inc. v. Leavitt*, 431 F.3d 812, 816–17 (D.C. Cir. 2005).

The relevant question, then, is not whether Plaintiffs have a means to obtain review, but rather whether channeling "would . . . mean no review at all," *Ill. Council*, 529 U.S. at 17, of the contention that the Rule unlawfully sets Medicare Part B reimbursement rates. But, there *is* potentially review of that contention. Providers seeking to challenge Medicare Part B reimbursements do not face uniquely "serious practical roadblock[s] to having their claims reviewed in any capacity." *Physician Hosps. of Am. v. Sebelius*, 691 F.3d 649, 655 & n.4 (5th Cir. 2012) (quotation marks omitted).

Accordingly, this Court should refrain from allowing Plaintiffs to interfere with the

administrative process by taking a shortcut around the non-waiveable presentment requirement.

### ii. Congress Barred Judicial Review of Decisions Related to the Center's Discretion.

Plaintiffs cast their claims in a variety of ways, but, at bottom, they challenge the "selection," "elements," "parameters," "scope," and "duration" of the MFN Model, which may not be judicially reviewed. *See* 42 U.S.C. § 1315a(d)(2). While there is undoubtedly a presumption of judicial review of administrative action, *see* Pls.' Mot. at 22-24, it is just that—a presumption—which "may be overcome by clear and convincing indications, drawn from specific language, specific legislative history, and inferences of intent drawn from the statutory scheme as a whole." *Cuozzo Speed Technologies, LLC v. Lee*, 136 S. Ct. 2131, 2140 (2016) (citations omitted). Here, Congress unambiguously stated:

> "There shall be no . . . judicial review . . . of . . .," among other things: (1) "the selection of models for testing or expansion under this section;" (2) "the selection of organizations, sites, or participants to test those models selected;" and (3) "the elements, parameters, scope, and duration of such models for testing or dissemination."

42 U.S.C. § 1315a(d)(2). When, as here, "Congress provides that 'there shall be no administrative or judicial review' of specific agency actions," the "intent to bar review is clear," so the Court need only determine whether this action "falls within the preclusive scope of the statute." *DCH Reg. Med. Ctr. v. Azar*, 925 F.3d 503, 505-06 (D.C. Cir. 2019). Plaintiffs' statutory constitutional, and procedural claims fall within the scope of the statute because they attack some "element" of the model or the Secretary's selection of the model, both of which are barred by the plain text of § 1315a(d)(2).

*1.* Plaintiffs may not escape § 1315a(d)(2)'s judicial bar by characterizing their claims as *ultra vires*. The mere characterization of their claim as an attack on the agency's authority is insufficient to overcome the statutory bar. When, as here, "the statute provides us with clear and convincing evidence that Congress intended to deny" judicial review, the characterization of a claim as *ultra vires* is insufficient to confer subject matter jurisdiction. *Bd. of Governors of Fed. Reserve System v. MCorp*, 502 U.S. 32, 44 (1991); *accord DCH Reg. Med. Ctr. v. Azar*, 925 F.3d at 509 (D.C. Cir. 2019) ("Following *MCorp*, there is not much room to contend that courts may disregard statutory bars on judicial review

just because the underlying merits seem obvious.").

*Ultra Vires* "[r]eview is . . . only available in extraordinary circumstances." *Duncan v. West*, 153 F.3d 719 (4th Cir. 1998). To overcome an express statutory bar such as § 1315a(d)(2), a party must satisfy three requirements: "(i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Id.* Plaintiffs do not satisfy the first or third requirement.

First, in barring judicial review, Congress explicitly stated that there shall be "no . . . judicial review," of the selection and elements of the Center's models. *Id.* § 1315a(d)(2). Because the "preclusion of review" is express, and not "implied" by the statute's "silence," Congress provided "clear and convincing" evidence of its intent to preclude judicial review of claims such as this, even when styled as *ultra vires* claims. *MCorp*, 502 U.S. at 44.[2] If this Court were to permit Plaintiffs to attack the MFN Model simply by claiming that the Secretary's choice of the model was *ultra vires*, the Court would "engage in the kind of case-by-case review of the reasonableness or procedural propriety of the Secretary's [decisions] that Congress intended to bar," rendering the bar on review meaningless. *See Fla. Health Sci. Ctr. v. Sec'y of Health and Human Servs.*, 830 F.3d 515, 522 (D.D.C. 2016).

Regardless, Plaintiffs have failed to allege that the agency "plainly act[ed] in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory," which is also fatal to plaintiffs' attempt to circumvent the statutory bar. *DCH Reg. Med. Ctr.*, 925 F.3d at 509. Even if the Court were to decide whether this requirement is satisfied, it "need not reach the ultimate merits" of the agency's position. *See Long Term Care Partners LLC v. US*, 516 F.3d 225, 234 (4th Cir. 2008). Rather, it must only answer the "more basic question of whether there is a strong and clear demonstration of a violation of a clear, specific, and mandatory statutory provision, or whether the agency's view, while perhaps not compelling beyond cavil, is nevertheless plausible." *Id.* at 235. If the agency's position is "capable of two plausible interpretations, the . . . decision to adopt one

---

[2] *But see Hanauer v. Reich*, 82 F.3d 1304, 1309-10 (4th Cir. 1996) (finding that *MCorp* did "not compel" a holding that Federal Employees' Compensation Act "precludes district courts from considering claims that the Secretary violated a clear statutory mandate").

interpretation over the other does not constitute a violation of a clear statutory mandate." *Hanauer*, 82 F.3d at 1309. As explained *infra*, Part I.B.iii-iv, Plaintiffs cannot satisfy this requirement.[3]

Though Plaintiffs can be awarded points for creativity, they have attempted what is "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nyunt v. Chairman, Broadcasting Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). Congress' intent to bar claims such as Plaintiffs is clear, and the court lacks subject matter jurisdiction over Plaintiffs' statutory claims.

*2.* Plaintiffs argue that their constitutional claims are exempt from § 1315a(d)(2)'s judicial bar. Pls.' Mot. 24. They argue, without explanation, that the statute "never mentions constitutional claims, let alone clearly precludes them." *Id.* But no court has articulated a "mentioning" test for constitutional claims when determining whether a preclusive statute bars those claims. In any event, Plaintiffs never explain why Congress' "intent" to bar constitutional claims is not "clear." *See Webster v. Doe*, 486 U.S. 592, 603 (1988). Indeed, Congress has broadly precluded all judicial review related to the selection and scope of reimbursement models under the statute, and Plaintiffs have provided no compelling reason to exclude constitutional claims from the scope of the preclusive bar.

Ultimately, however, the Court need not decide whether Congress intended to bar judicial review of constitutional claims related to the Center, as Plaintiffs' constitutional claims are merely their statutory claims reinvented. *See Synopsys, Inc. v. Matal*, 280 F. Supp. 3d 823, 834 (E.D. Va. 2017) (rejecting plaintiff's "attempt to use artful pleading to circumvent" statutory bar to judicial review). Plaintiffs argue that the Rule violates the Constitution's bicameralism and presentment requirement because the Rule has the "legal and practical effect of repealing duly enacted statutes," Pls.' Mot. 20, and runs afoul of the non-delegation doctrine because there is no "intelligible principle" in § 1315a for the Secretary's authority, *id.* at 21. But the bicameralism and presentment argument is no more

---

[3] Plaintiffs' reliance on *Amgen, Inc. v. Smith*, 357 F.3d 103 (D.C. Cir. 2004) to support a contrary conclusion is misplaced. *See* Pls.' Mot. 23-24. There, the D.C. Circuit stated, in dicta, that it would construe a bar on judicial review to allow limited review of claims of *ultra vires* action, but then found that it lacked jurisdiction to consider the claim that arose in that case. *Amgen, Inc.*, 357 F.3d at 118. In *DCH Regional Medical Center*, the D.C. Circuit then clarified that *ultra vires* review is permitted only when "the statutory preclusion of review is implied rather than express" and "the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." 925 F.3d at 509. As explained above, neither of those requirements is satisfied here.

than a challenge to the Secretary's waiver of requirements of the Medicare statute, which is explicitly contemplated in § 1315a(d)(1), and the non-delegation claim is no more than a challenge to the Secretary's selection of the model, also explicitly barred from review. When, as here, a plaintiff makes "speculative and conclusory allegations of constitutional violations" that are "essentially characterizations" of their challenge to the underlying merits, the Court "do[es] not have jurisdiction to review such a determination." *See Hegab v. Long*, 716 F.3d 790, 791 (4th Cir. 2013).

*3.* Finally, Plaintiffs argue that § 1315a(d)(2) does not apply to their claim that CMS unlawfully promulgated the Rule without notice and comment. *See* Pls.' Mot. 23. But, in the Medicare context, courts have generally held that the purported distinction between procedural and substantive challenges is irrelevant to determining the availability of judicial review.

Most instructive is the Supreme Court's decision in *Heckler v. Ringer*, 466 U.S. 602 (1984), in which Medicare beneficiaries sought to challenge a policy of not providing reimbursement for a certain operation, including on the ground that "the Secretary violated the rulemaking requirements of the APA, 5 U.S.C. § 553, in issuing" the challenged policy. *Id.* at 610 n.7. The beneficiaries did not comply with the Medicare administrative process, but instead sought to invoke general federal-question jurisdiction under 28 U.S.C. § 1331. The Supreme Court explicitly rejected the beneficiaries' attempt to justify their claims as "procedural" in nature and therefore outside the preclusion provision. *Ringer*, 466 U.S. at 614.

Noting that the beneficiaries included a challenge to the Secretary's "alleged failure to comply with the rulemaking requirements of the APA," the Court found that the claim was "inextricably intertwined" with their underlying claim for benefits, which was clearly barred from judicial review. *Id.* The Court recognized that, while raising a "supposed procedural" claim the Plaintiffs, in fact, sought substantive relief—"the invalidation of the Secretary's current policy and a substantive declaration from her that the expenses of BCBR surgery are reimbursable under the Medicare Act." *Id.* And the Court was careful to emphasize that, "simply because a claim somehow can be construed

as procedural," that does not make it cognizable in federal court.[4]  *Id.*

Thus, at least in the context of Medicare jurisdiction, Congress need not use any magic words to preclude purportedly procedural claims.  Rather, even procedural claims are precluded when they raise a claim that falls within the plain text of a preclusion provision.  "[T]o be true to the language of the statute, the inquiry in determining whether § 405(h) bars federal-question jurisdiction must be whether the claim 'arises under' the Act, not whether it lends itself to a 'substantive' rather than a 'procedural' label."  *Ringer*, 466 U.S. at 615.

Here, Plaintiffs challenge the manner in which the Secretary promulgated the MFN Model, i.e. through an interim final rule rather than through advance notice and comment rulemaking.  But this question is "inextricably intertwined" with the merits of a substantive challenge to the "selection" of the MFN Model, which § 1315a(d)(2) explicitly bars .  Tellingly, as in *Heckler*, Plaintiffs do not seek simply to force the agency to go through notice and comment rulemaking.  Rather, they seek invalidation of the MFN Rule in its entirety.  *See* Pls.' Mot. 35.  Because the supposed "procedural irregularities" in the "promulgation," are intertwined with the selection of the MFN Model, § 1315a(d)(2) strips the Court of subject matter jurisdiction to consider Plaintiffs' procedural challenge. *See Starnes v. Schweiker*, 748 F.2d 217 (1984).

### B.  Plaintiffs' Substantive Claims are Without Merit.

#### i.  CMS Properly Waived Notice and Comment for Good Cause under the APA and the Medicare Statute.

Though agencies typically issue rules after notice and an opportunity to comment, an agency may forgo advance notice and comment "when the agency for good cause finds. . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to public interest."  5 U.S.C. §

---

[4] More recently, the Supreme Court re-affirmed *Ringer* in *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1 (2000) (hereafter *Illinois Council*), in which an association of nursing homes sought to challenge certain Medicare regulations on a variety of grounds, including that they violated the APA's notice and comment requirements.  *See id.* at 7.  The nursing homes argued that their claims could proceed under federal-question jurisdiction because they were "general" and "collateral" challenges rather than "fact-specific" or "noncollateral" claims.  *Id.* at 13-14.  The Supreme Court again rejected those purported distinctions, and held that *Ringer* was controlling.  *See id.* at 13 ("Despite the urging of the Council and supporting *amici*, we cannot distinguish . . . *Ringer* from the case before us.").

553(b)(B); 42 U.S.C. § 1395hh(b)(2)(C) (incorporating this exception into the Social Security Act's rulemaking requirement for the Medicare program). An agency may also make a rule immediately effective if it finds good cause to do so and explains that rationale in the rule. 5 U.S.C. § 553(d)(3). Courts generally construe the good cause exception narrowly, but it also serves as "an important safety valve to be used where delay would do real harm." *United States v. Dean*, 604 F.3d 1275, 1279 (11th Cir. 2010). Though a court's "review of the agency's legal conclusion of good cause is *de novo*," the court must "defer to an agency's factual findings and expert judgments therefrom, unless such findings and judgments are arbitrary and capricious." *Sorenson Comm'n, Inc. v. FCC*, 755 F.3d 702, 706, 706 n.3 (D.C. Cir. 2014). And, even if this Court concludes that a single one of CMS's justifications, "standing alone," would not constitute good cause, the Court must consider whether the "combined effect" of that justification with others suffices. *Nat'l Women, Infants, & Children Grocers Ass'n v. Food & Nutrition Serv.*, 416 F. Supp. 2d 92, 107 (D.D.C. 2006).

CMS satisfied the requirements of the good cause exception. It first noted the economic impact of out-of-pocket costs on Medicare Part B beneficiaries, finding that "increases in drug prices are causing beneficiaries to divert scarce resources to pharmaceutical treatments and away from other needs, or prompting them to skip doses of their medications, take less than the recommended doses, or abandon treatment altogether." 85 Fed. Reg. 76249. CMS also found that, since "more than 25 million Medicare beneficiaries" live at or below 200 percent of the Federal Poverty Line, high drug prices for this population could result in "improper medication adherence or skipped treatment," which "can result in poor clinical outcomes for chronic disease management." *Id.* With the risk of severe illness from COVID-19 increasing "with age and the presence of chronic illnesses," combined with the inability to afford medications to manage chronic disease, CMS determined that "many older adults" are "at the highest risk levels." *Id.* Also considering the "historic levels of unemployment in the U.S." and "the increase in food prices" due to the pandemic, CMS concluded, "this population is in need of urgent relief from high drug prices in order to prevent stinting on care and alleviate general financial instability worsened by the COVID-19 pandemic." *Id.*

CMS concluded, "there is good cause to waive the notice and comment requirements . . .

because of the particularly acute need for affordable Medicare Part B drugs now, in the midst of the COVID-19 pandemic." *Id.* CMS also explained why urgent action was needed at this point in the pandemic, in particular: "[W]e are currently seeing a new surge in COVID-19 cases that may lead to additional hardship and requires immediate action." *Id.* (citing Centers for Disease Control and Prevention. COVID–19 Forecasts: Cases, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/forecasts-cases.html). Accordingly, CMS determined that implementation of the MFN Model "will provide immediate relief to Medicare beneficiaries through reduced copays for MFN drugs due to lower drugs payments and no beneficiary cost-sharing on the alternative add-on payment." *Id.*

Plaintiffs' attempt to discount the urgent need to make medication more affordable for seniors in this time of unprecedented economic and health challenges, but their claims have no merit. For example, Plaintiffs argue that CMS's delay in issuing the Rule precludes any finding of good cause to dispense with notice and comment. *See* Pls.' Mot. 13-14. But this argument fails because they ignore CMS's explicit finding that the timing of the Rule was necessarily because of a change in the trajectory of the pandemic, not simply the existence of the pandemic itself, or the existence of high drug prices. *See* 85 Fed. Reg. 76249 (discussing "new surge").[5] Plaintiffs similarly ignore CMS's factual finding that the "new surge in cases" requires "immediate action," *id.*, in arguing that good cause is precluded simply because "the COVID-19 pandemic was declared a public health emergency" earlier this year. *Id.* The constantly changing landscape of the pandemic and the resulting compounding harm reasonably underlie the Secretary's decision.

Plaintiffs take issue with the fact that the Rule implements a test of the model that they say is "far longer than any emergency connected with the pandemic" and is not tailored to address a

---

[5] Thus, the timing of the Rule is distinguishable from that of the agency actions in Plaintiffs' cited cases, where the agency failed to support its decision to issue an interim final rule. *See Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5, 17 (D.D.C. 2017) (noting that, because the Government "never explains the time lag," the agency "may well be decrying an emergency of its creation," but declining to "resolve whether it has forfeited any good-cause defense"); *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 114 (D.C. Cir. 2018) (unexplained delay when "effective date of the [rule] was imminent only insofar as [the agency's] third finite delay was scheduled to elapse").

temporary emergency.  Pls.' Mot. 14.  But there is no requirement that the changes imposed by a rule only be beneficial for a temporary period of time in order for an agency to invoke the APA's good cause exception.  What is relevant is whether the immediate circumstances justify the issuance of the Rule.  Moreover, CMS is accepting comments until January 26, 2021, allowing it to consider the propriety of continuing the MFN Model.  *See* 85 Fed. Reg. 76180; *Coalition for Parity, Inc. v. Sebelius*, 709 F. Supp. 2d 10, 23 (D.D.C. 2010) ("[T]he continued solicitation of comments after promulgation of the Interim Final Rules suggests that Defendants have kept an open mind as to the impact of its rules on the regulated community.").  CMS will also conduct an evaluation of the MFN Model, as required by statute, and must terminate or modify the design of the model after testing has begun if the MFN Model does not achieve the Center's statutory goals.  *See* 85 Fed. Reg. 76232-33; 42 U.S.C. §§ 1315a(b)(4)(A)-(B); 1315a(c).  These safeguards illustrate that CMS has not attempted to evade notice and comment to achieve a permanent regulatory outcome here.

Plaintiffs oversimplify CMS' position into one of merely trying to accelerate the benefits of its rulemaking.  Pls.' Mot. 14.  In fact, as CMS states in the Rule, it is the present effects of the pandemic that necessitate moving forward without notice and comment, not the need to reduce seniors' drug prices in a vacuum.  Thus, the Rule is distinguishable from the one considered by the Second Circuit in *Zhang v. Slattery*, 55 F.3d 732 (2d. Cir. 1995).  There, the court considered whether an interim final rule setting forth certain grounds for seeking political asylum was promulgated in violation of the APA.  *Id.* at 739, 746.  The agency defended the rule by arguing, "immediate promulgation is necessary in order to benefit the greatest number of aliens."  *Id.* at 747.  The court concluded that the agency had not set forth good cause, as required by the APA by simply attempting to "accelerate[]" the "beneficial effect" of their rule.  *Id.*  Here, in contrast, the agency is responding to a "new surge" in the pandemic and the resulting economic effects by reducing a cost burden to a vulnerable population.[6] 85 Fed. Reg. 76249.

---

[6] For similar reasons, Plaintiffs' reliance on *Chamber of Commerce of the United States v. DHS*, 2020 WL 7043877 (N.D. Cal. Dec. 1, 2020), is misplaced.  There, the court determined that there was a "significant mismatch of facts regarding the unemployment caused by the proliferation of the pandemic and the classes or workers impacted by the Rules," in holding that the agency's interim final

16

Plaintiffs attempt to undermine the good cause underlying the promulgation of MFN Model by cherry-picking one class of drugs excluded from the model and improperly relying on it to extrapolate broad conclusions applying to all Medicare Part B drugs. *See* Pls.' Mot. 15. CMS rationally determined that seven classes of drugs that may otherwise be covered under Part B should be excluded from the model for a variety of reasons, including sourcing, billing complexity, and use setting. *See* 85 Fed. Reg. 76190-91. One of these classes includes drugs subject to an emergency use authorization and drugs that receive future Food & Drug Administration approval to treat COVID-19, on the basis that excluding these drugs "will minimize any potential for the MFN Model to impact rapid, widespread availability of such drugs in the U.S." *Id.* at 76191. Plaintiffs improperly extrapolate the concerns related to new and experimental drugs that must quickly enter the supply chain to be widely distributed, to the fifty well-established drugs that are the subject of the MFN Model. That CMS anticipated access issues with respect to one particular class of drugs does not undermine the urgent need to reduce the cost of other drugs for seniors immediately.

### ii. CMS Promulgated the MFN Model within its Statutory Authority.

As part of the Affordable Care Act, Congress authorized the Secretary, through the Center for Medicare and Medicaid Innovation, to create bold new innovative solutions (in the form of models) designed to test the reduction of program expenditures while preserving or enhancing the quality of care for Medicare and Medicaid beneficiaries. 42 U.S.C. § 1315a(a)(1). The MFN Model Rule is one such innovative solution. It charts a seven-year, nationwide model to test the reduction of expenditures paid by beneficiaries and the government for 50 Medicare Part B drugs by tying the Medicare payment allowance for these drugs to prices paid by our international counterparts.

To facilitate innovation, Congress established two distinct phases of model testing: (1) an initial model test (Phase I); and (2) an optional model expansion (Phase II). *See* 42 U.S.C. § 1315a(b) (Phase I); *id.* § 1315a(c) (Phase II). During Phase I, the Secretary "*may* elect to limit testing of a model to a certain geographic area." *Id.* § 1315a(a)(5) (emphasis added). Instead of placing inflexible scope

rule was issued in violation of the APA." *Id.* at *10. Here, in contrast, the vulnerable population is directly impacted by the Rule.

or geographic limits on a Phase I model, Congress supplied different metrics. Specifically, a Phase I model need only be a (1) an innovative payment and service delivery model; (2) addressing a defined population for which there are deficits in care leading to poor clinical outcomes or potentially avoidable expenditures; and (3) capable of evaluation. *See* 42 U.S.C. § 1315a(b).

The MFN complies with each of those criteria.[7] It is a payment model directed at the defined population of Medicare Part B beneficiaries using a covered drug, for which there have been skyrocketing costs that the Secretary determined should be addressed. Specifically, the MFN Model will test "whether more closely aligning payment for Medicare Part B drugs and biologicals … with international prices and removing incentives to use higher-cost drugs can control unsustainable growth in Medicare Part B spending without adversely affecting quality of care for beneficiaries." 85 Fed. Reg. 76,180.

Plaintiffs present a laundry list of ways in which they believe the Rule exceeds CMS's statutory authority, but none are persuasive. Plaintiffs first contend that the Rule is "flatly inconsistent" with 42 U.S.C. § 1315a because the Rule is a "complete overhaul of Medicare Part B, not the limited 'test' the law envisions." Pls.' Mot. at 16. In particular, Plaintiffs point to the words "test," "model," and "defined population," as an indication that the Rule can only operate "on a limited basis" or "on a small scale" and not on a nationwide basis. *Id.* But the words "limited" and "small scale" appear nowhere in the text, and the statutory context makes clear that a Phase I model need not be "on a limited basis" or a "small scale." After all, statutory interpretation does not take place "in a vacuum," *Tyler v. Cain*, 533 U.S. 656, 662 (2001).

"Tested" and "model" are both inherently contextual terms, the definition of which will depend on the actor, the product, and the market. The text of § 1315a supplies this crucial context:

---

[7] This court's review of the Secretary's compliance with § 1315a is governed by the *Chevron* framework. *See Chevron, U.S.A, Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842–43 (1984). To the extent the court determines that the plain meaning of the statute is ambiguous, it must accord deference to the Secretary's interpretation of the statute. *See MacKenzie Med. Supply v. Leavitt*, 506 F.3d 341, 346 (4th Cir. 2007) ("[B]ecause the Secretary is charged with administering the Medicare Act, we substantially defer to the Secretary's construction of any ambiguous language in the Act, if the Secretary's construction "is based on a permissible construction of the statute.").

Congress authorized the Secretary to test models in Phase I that are sizeable in scope—including payment and service-delivery models implemented on a multi-year, nationwide basis. For example, although during Phase I, the Secretary "*may* elect to limit testing of a model to a certain geographic area," 42 U.S.C. § 1315a(b)(5) (emphasis added), the Secretary is not required to do so, and is thus permitted to implement a Phase I model on a nationwide basis. Moreover, Congress specifically contemplated models that could be implemented on a nationwide scale, such as "[p]romoting broad payment and practice reform in primary care." *Id.* § 1315a(b)(2)(B)(i).

Plaintiffs make much of the fact that Congress contemplated that one type of expansion to Phase II may include "implementation on a nationwide basis." *See* Pls.' Mot. At 17–18 (quoting § 1315a(c)). But, while Plaintiffs interpret this phrase as ironclad proof that a Phase I model can never be implemented on a nationwide basis without rulemaking, it is simply a recognition of a situation contemplated by the statute: the Secretary may choose to limit the geographic scope of a model under Phase I. 42 U.S.C. § 1315a(a)(5). In such an instance, moving from implementing a model on a regional basis to a national basis *would* constitute an expansion of the scope of a model under Phase II according to the text of the statute. Indeed, this Rule furnishes an example of why it may be advantageous to test a Phase I model on a nationwide basis. The unique nationwide nature of the pharmaceutical market would complicate CMS's ability to test and evaluate a drug-specific model on a smaller-than-nationwide scale. *See* 85 Fed. Reg. 76,188.

Plaintiffs incorrectly contend that the Rule does not identify the "defined population" with "deficits in care leading to poor clinical outcomes or potentially avoidable expenditures." 42 U.S.C. § 1315a(b)(2)(A); Pls.' Mot. 17. In the "Defined Population" section of the Rule, CMS states: "the defined population for the MFN Model will be Medicare FFS beneficiaries who receive an MFN Model drug from an MFN participant where payment for such drug is allowed under the MFN Model." 85 Fed. Reg. 76,183. As the excerpted language makes clear, the MFN does in fact address a population that is "narrower than the general population of Medicare beneficiaries." Pls' Mtn. 16. For example, the defined population included in the model does not include Medicare FFS beneficiaries who receive drugs that are not one of the 50 tested in the Model; nor does it apply to

Medicare beneficiaries who receive services through a managed care (as opposed to fee-for-service (FFS)) model. The Rule also sets forth "potentially avoidable expenditures," with estimated cost savings predicted to amount to $85.5 billion in Medicare Part B spending, and $28.5 billion for Medicare beneficiaries. 85 Fed. Reg. 76,181.

Plaintiffs contend that: the model "defies meaningful evaluation" because there is no independent comparison group to establish a counterfactual. Pls.' Mot. 18; *see also* 42 U.S.C. § 1315a(b)(4) (listing evaluation requirements). But this contention lacks merit. Despite the absence of a counterfactual comparison group, the Rule contains a detailed discussion about the method CMS will employ to evaluate the MFN model. 85 Fed. Reg. 76,232–34 ("*Because* the MFN Model will be a nationwide, mandatory model, we must employ an evaluation design that does not require an independent comparison group to establish the counterfactual (what would have happened in the absence of the model).") (emphasis added). An independent comparison group is not statutorily required for an evaluation of a Phase I model, and Plaintiffs fail to explain why CMS's explained approach would "def[y] meaningful evaluation." Pls.' Mot. at 18.

Plaintiffs next assert that CMS's interpretation "conflicts with the Secretary's 'recommendations for legislative action to facilitate the development and expansion of successful payment models' in . . . annual reports to Congress." *Id.* (quoting 42 U.S.C. § 1315a(g)). Plaintiffs theorize that if CMS can adopt nationwide models during Phase I, an agency can override Congress's will and "facilitate the development and expansion of successful payment models" without any congressional involvement. *See* 42 U.S.C. § 1315a(g) (describing a bi-annual report to Congress). Plaintiffs' argument rests on several misconceptions about subsection (g). Regardless of the scope or duration of a model, every two years CMS is required to report to Congress models tested under Phase I and Phase II. *Id.* There is nothing preventing Congress, upon receiving a report about a Phase I model, from altering the Secretary's authority. And Plaintiffs are simply incorrect to suggest that the Secretary's recommendation about legislative action is in any way bound to the scope of a model. *See* 42 U.S.C. § 1315a(g). Instead, "…each such report shall provide such recommendations as the Secretary determines are appropriate for legislative action to facilitate the development and expansion

of successful payment models." *Id.*

### iii. Section 1315a satisfies the constitutional requirement of presentment.

Article I of the Constitution includes the Presentment Clause, which the Supreme Court has interpreted to bar "unilateral Presidential action that either repeals or amends parts of duly enacted statutes," which wholly prevents legislation "from having legal force or effect." *Clinton v. City of New York*, 524 U.S. 417, 438-39 (1998); U.S. Const., Art. I, § 7, cl. 2. Plaintiffs contend 42 U.S.C. § 1315a, as interpreted and applied by the Secretary, violates the Constitution's presentment requirement because it empowers the Secretary to "repeal and replace key provisions of the Medicare statute." Pls. Compl. ¶ 8. But Plaintiffs' premise is fundamentally incorrect. Even after the effective date of the MFN Model, the provisions to which Plaintiffs refer will continue to maintain "legal force and effect." *Clinton*, 524 U.S. at 428.

To support an argument that the Secretary acted unilaterally to scuttle the policy judgment of Congress, Plaintiffs rely entirely on *Clinton v. City of New York*. In that case, however, the Court invalidated the Line Item Veto Act, which gave the President veto authority to "cancel in whole" certain appropriated spending items enacted by Congress a mere days earlier. *Id.* at 436. The President's "cancellation" prevented those items "from having legal force or effect," and thus in "*both* legal and practical effect, the President ha[d] amended two Acts of Congress by repealing a portion of each." *Id.* at 438 (emphasis added). The Court contrasted the Line Item Veto Act with the Tariff Act, which the Court previously upheld in the face of a legislative-delegation challenge. *Id.* at 442–44 (discussing *Field v. Clark*, 143 U.S. 649 (1892)). In contrast with the Tariff Act, in which the President was "executing the policy that Congress had embodied" in the Act, the Line Item Veto Act allowed the President "within five days" to "reject [] the policy judgment made by Congress and rely[] on his own policy judgment." *Clinton*, 524 U.S. at 444 & n.35.

Section 1315a(d)(1) differs drastically from the Line Item Veto Act and does not amount to the amendment or repeal of a statute. It is undisputed that 42 U.S.C. § 1315a—the statutory authority for the Rule—itself passed both houses of Congress, and was signed into law by the President of the

United States.  It is *that* duly enacted statute—not the Rule—which expresses the policy judgment of Congress that was carried out by CMS.  This Congressional policy judgment includes the creation of the Center to "test innovative payment and service delivery models" with the goal of "reduc[ing] program expenditures" while maintaining, or even improving, a high standard for "quality of care." 42 U.S.C. § 1315a(a)(1).  To ensure maximum flexibility in this endeavor, Congress included a waiver provision, which explicitly authorizes the Secretary to waive otherwise applicable requirements under the Medicare statute.  *See* 42 U.S.C. § 1315a(d)(1).  One such waiveable provision includes the Medicare Part B drug reimbursement provision.  *See Id.* § 1395w-3a.

Plaintiffs remarkably contend that because the Rule will change the market-based reimbursement system for *some* Medicare Part B drugs, the Rule has the "legal and practical effect" of repealing § 1395w-3a.  Pls' Mot. 20–21.  But Section 1395w-3a undeniably retains its "legal force and effect" after the effective date of the Rule, and thus cannot be said to be effectively repealed.[8]

Plaintiffs identify no basis to conclude that the waiver provision in § 1315a violates the Constitution.  *See Republic of Iraq v. Beaty*, 556 U.S. 848, 861 (2009) ("The [statutory] proviso *expressly* allow[ing] the President to render certain statutes inapplicable . . . . did not repeal anything, but merely granted the President authority to waive the application of particular statutes to a single foreign nation.").  The U.S. Code and the Medicare statute itself are replete with examples of waivers, and such waivers are routinely upheld.  *See Beaty*, 556 U.S. at 861 ; *see also Defs. of Wildlife v. Chertoff*, 527 F. Supp. 2d 119, 125 & n.5 (D.D.C. 2007) (collecting some of the "myriad examples of waiver provisions in federal statutes").  *See also* 42 U.S.C. §§ 1315(a)(1), 1395jjj(f), 1395b-1, 1395cc-3(e), 1395cc-4(d), 1395cc-5(e)(6), 1395cc-6(i) (Medicare-specific waivers).  In short, these statutory waivers are not uncommon, and they are certainly not unconstitutional.

And though Plaintiffs make much out of the fact that the Rule affects changes to the

---

[8] Even after the MFN Model goes into effect, the Medicare Part B reimbursement rates described in the statute will still be in effect for more than 500 drugs not covered by the Rule.  *See* https://www.cms.gov/index.php/medicare/medicare-part-b-drug-average-sales-price/2021-asp-drug-pricing-files (most recent Part B pricing list).  And in 2021, the model tests drug payments that will continue to be based on 75% of the market-based payment rates provided for in § 1395w-3a, in most cases.

reimbursement system for the purposes of testing the MFN Model, *Congress*—not the Executive—made that policy judgment.  The Secretary did not act unilaterally  to substitute his judgment about Medicare pricing "to repeal Congress's reimbursement scheme and replace it with one of CMS's own making."  Pls.' Mot. at 21.  He invoked a valid statute to accomplish ends § 1315a explicitly permits, and in so doing, *executed* rather than rejected the will of Congress.  *Clinton*, 524 U.S. at 444.  That does not violate the Presentment Clause.[9]

### iv.  Section 1315a does not violate the non-delegation doctrine.

Plaintiffs argue that if Congress can indeed authorize the Secretary to waive statutory provisions of the Medicare statute, this would amount to an unconstitutional delegation of legislative authority.  Plaintiffs make passing reference to list of legislative prerogatives that conflict with § 1315a or have been unlawfully delegated to CMS: the "market-based drug-pricing system Congress designed to promote innovation"; "Congress's exclusive power over the patent system"; and "Congress's exclusive and plenary authority to regulate foreign commerce."  Pls.' Mot. 17–19.  This represents a rather remarkable claim, considering that "[o]nly twice in this country's history (and that in a single year)," has the Supreme Court "found a delegation excessive"—with the last example taking place over eighty years ago.  *Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (plurality op.); *see A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) (the "sick chicken" case); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935).  In both unconstitutional delegations, "'Congress had failed to articulate *any* policy or standard' to confine discretion."  *Gundy*, 139 S. Ct. at 2129 (quoting *Mistretta v. United States*, 488 U.S. 361, 373 n.7 (1989)).[10]  That is not true here.

---

[9] Perhaps realizing that the source of Plaintiffs' complaint arises out of a duly-enacted law meeting the bicameralism and presentment requirements, Plaintiffs make the puzzling assertion that "Congress cannot alter the procedures set out in Article I, § 7, without amending the Constitution."  Pls.' Mot. 22.  Though the meaning of this statement is far from clear, it seems to indicate that Congress is without authority to enact laws that may, at times, override prior laws.  But there is simply no requirement—constitutional or otherwise—that Congress take some clerical action to formally amend or repeal an older law (or regulation) before enacting a new law.  *See, e.g., Hellon & Assocs., Inc. v. Phoenix Resort Corp.*, 958 F.2d 295, 297 (9th Cir. 1992) ("In case of an irreconcilable inconsistency between them the later and more specific statute usually controls the earlier and more general one.").

[10] Summing up its own record, the Supreme Court observed that "[i]n the history of the Court we have found the requisite 'intelligible principle' lacking in only two statutes," noting that one statute

Although Congress may not delegate its legislative power to the Executive Branch, *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43 (1825), "Congress may 'obtain[ ] the assistance of its coordinate Branches'—and in particular, may confer substantial discretion on executive agencies to implement and enforce the laws." *Gundy*, 139 S. Ct. at 2123 (quoting *Mistretta*, 488 U.S. at 372). With this understanding, the Court has "over and over upheld even very broad delegations." *Id.* at 2129.

A statutory delegation passes muster if Congress provides "an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform." *J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928). Under that standard, a delegation is "constitutionally sufficient if Congress clearly delineates": (1) "the general policy" to be pursued, (2) "the public agency which is to apply it," and (3) "the boundaries of th[e] delegated authority." *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946). As in *Gundy*, and nearly every case before it, Congress's delegation to the Secretary in 42 U.S.C. § 1315a "easily passes constitutional muster." *Gundy*, 139 S. Ct. at 2121.

Congress identified the relevant public agency as the Department of Health and Human Services by expressly vesting the Secretary with the discretion to carry out § 1315a. *Am. Power & Light*, 329 U.S. at 105. Congress also supplied ample guidance about the general policy to be pursued, along with certain limiting principles. Section 1315a sets forth Congress's general policy: to create the Center to "test innovative payment and service delivery models to reduce program expenditures under the applicable subchapters while preserving or enhancing the quality of care furnished to individuals under such subchapters." 42 U.S.C. § 1315a(a)(1). That statement limits the Center's authority to the "duties described in this section." *Id.* It further bounds the general policy by identifying specific purposes: "to test innovative payment and service delivery" for one end: "to reduce program expenditures … while preserving or enhancing the quality of care." *Id.* In addition, the model must be an "innovative payment and service delivery model," *id.*, which is capable of being evaluated. *Id.* § 1315a(b)(4).

---

"provided literally no guidance for the exercise of discretion," while the other "conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001).

Congress also articulated specific boundaries to constrain the authority it delegated to the Secretary in describing the phases of model testing. As discussed above, the statute establishes two distinct phases of model testing. *See* 42 U.S.C. § 1315a(b), (c). For Phase I models, the Secretary can select "payment and service delivery models in accordance with selection criteria under paragraph (2)." *Id.* § 1315a(b)(1). Paragraph 2, in turn, describes that just two reasons would allow the Secretary to test a model. The Secretary must identify a model that includes "a defined population for which there are deficits in care leading to poor clinical outcomes or potentially avoidable expenditures." *Id.* § 1315a(b)(2). Further demarcating this effort, Congress directed that the Secretary "shall focus on models expected to reduce program costs under the applicable subchapter while preserving or enhancing the quality of care received by individuals receiving benefits under such subchapter." *Id.* § 1315a(b)(2)(A). So, too, is the continuation of the model tied to Congress's policy judgment: "at any time after testing has begun," Phase I testing "shall" be terminated or modified "unless the Secretary determines" that the model is expected to (1) "improve the quality of care . . . without increasing spending"; (2) "reduce spending . . . without reducing the quality of care"; or (3) "improve the quality of care and reduce spending." *Id.* § 1315a(b)(3)(B). Section 1315a(b)(4) also requires that every Phase I model test include an evaluation of both cost and quality. And finally, the statute directs that "[t]o the extent feasible, the Secretary shall select measures [for the evaluation] that reflect national priorities for quality improvement and patient-centered care." *Id.* § 1315a(b)(4)(C).

Plaintiffs ignore these textually explicit limits on the Secretary's authority, instead asserting that § 1315a "contains no 'intelligible principle' whatsoever." Pls.' Mot. 22. Plaintiffs further posit that because the statute may implicate "vast economic and political significance," it represents an "Executive aggrandizement" of legislative power. *Id.*[11] But, of course, the relevant legal question is not whether a delegation of authority is broad or allows an agency to regulate on matters implicating matters of economic significance. "[I]n our increasingly complex society, replete with ever changing

---

[11] Plaintiffs also repeat their argument that the MFN Model represents a "repudiat[ion]" of "Congress's market-based approach to drug pricing." Pls.' Mot. 22. But as explained above, Congress itself authorized a waiver of such a market-based approach as necessary to test the model.

and more technical problems,' [the Supreme] Court has understood 'that Congress simply cannot do its job absent an ability to delegate power under broad general directives.'" *Gundy*, 139 S. Ct. at 2123.

Ultimately, the question is not whether Congress broadly delegated authority. Congress undoubtedly has the authority to delegate broad authority to executive agencies. Courts consider only whether that delegation is so standardless, so lacking in any guiding principles, as to provide no guidance whatsoever. Section 1315a provides specific benchmarks, and ample standards to guide the Secretary's selection and testing of payment and service deliver models. It does not violate the nondelegation doctrine.

## II. PLAINTIFFS HAVE FAILED TO ESTABLISH THE REQUISITE SHOWING OF IRREPARABLE HARM.

### A. Plaintiffs Are Not Entitled to a Temporary Restraining Order Based on the Risk of Irreparable Injury to Third Parties.

Plaintiffs contend that the Rule will "irreparably harm patients' health by obstructing their access to needed medications." Pls.' Mot. 25. But plaintiffs seeking a temporary restraining order cannot simply assert that *someone* will be irreparably harmed by the challenged action. Rather, a plaintiff must show that "*he or she* is 'likely to suffer irreparable harm in the absence of preliminary relief'" *Pashby v. Delia*, 709 F.3d 307, 328-29 (4th Cir. 2013) (quoting *Winter*, 555 U.S. at 20)) (emphasis added). Plaintiffs cite *Mayor & City Council of Baltimore v. Azar* for the proposition that "[t]he Fourth Circuit has held that irreparable injury occurs when the public loses medical services." 392 F. Supp. 3d 602, 618 (D. Md. 2019). But the court's support for that proposition was a case holding that "*beneficiaries of public assistance* may demonstrate a risk of irreparable injury by showing that enforcement of a proposed rule may deny them needed medical care." *Pashby*, 709 F.3d at 329 (emphasis added). Plaintiffs are professional associations whose members include health care professionals and practices and pharmaceutical and biotechnology companies, not Medicare beneficiaries.

Plaintiffs insist that they "have standing to represent patients whose health will suffer" because "[p]roviders may assert the irreparable injuries of their patients, and organizations may assert the irreparable injuries of their members." Pls.' Mot. 26-27 (internal citations omitted). Not so. As an

initial matter, third party standing is "generally forbidden." *Bailey v. Atl. Auto. Grp.*, 992 F. Supp. 2d 560, 566 (D. Md. 2014). Courts have allowed some limited exceptions to this rule where "the party asserting the right [has] a 'close' relationship with the third party" and "the third party [is] hindered in bringing suit to vindicate its own rights." *Zaycer v. Sturm Foods, Inc.*, 896 F. Supp. 2d 399, 408 (D. Md. 2012) (citing *Kowalski v. Tesmer*, 543 U.S. 125, 129-30 (2004)).

But Plaintiffs make no mention of these requirements. Instead, Plaintiffs suggest that all healthcare providers may assert claims on behalf of their patients. Plaintiffs' sole support for their incorrect claim that providers may seek a preliminary injunction based on injuries to their patients is a 1998 case from the Eastern District of Virginia where a group of physicians challenged a state statute prohibiting partial birth abortions. *See* Pls.' Mot. at 25-26 (citing *Richmond Med. Ctr. for Women v. Gilmore*, 11 F. Supp. 2d 795, 809 (E.D. Va. 1998)). In that case, the court considered not only the possibility of irreparable harm to the providers, but also the allegedly irreparable injury to patients seeking abortions. *See Richmond Med. Ctr.*, 11 F. Supp. 2d at 809-10. But the fact that physicians may sometimes be permitted to "invoke the rights of their actual or potential patients in challenges to abortion-related regulations" does not mean that all physicians may invoke the rights of all patients in any legal proceeding. *June Med. Servs. LLC v. Russo*, 140 S. Ct. 2103, 2118 (2020). In *Singleton v. Wulff*, the Supreme Court considered whether a physician could assert a patient's right to an abortion by looking at (1) "the relationship of the litigant to the person whose right he seeks to assert," and (2) "the ability of the third party to assert his own right." 428 U.S. 106, 115-16 (1976). In doing so, the Court identified a number of factors that can hinder an individual's assertion of the right to an abortion. *Id.* at 117. First, an individual seeking an abortion "may be chilled" by a desire for privacy and to avoid "the publicity of a court suit." *Id.* Second, the time-sensitive nature of pregnancy and abortion create a situation of "imminent mootness, at least in the technical sense," of any individual claim. *Id.* While "these obstacles are not insurmountable," courts have recognized that they may create a scenario where "it generally is appropriate to allow a physician to assert the rights of . . . patients as against governmental interference with the abortion decision." *Id.* at 118-19.

Plaintiffs have identified no such obstacles hindering their patients' ability to vindicate their

own rights through court proceedings. Thus, Plaintiffs cannot rely on purported harms to their patients in seeking a temporary restraining order.

### B. Plaintiffs Have Not Demonstrated That Health Care Providers Will Experience Considerable Economic Harm In the Absence of Preliminary Relief.

Plaintiffs' main argument that health care providers will suffer irreparable harm is that they cannot recover monetary damages from Defendants (Pls.' Mot. 28), but that alone cannot establish irreparable harm. Plaintiffs cite a Fourth Circuit case stating that "economic damages may constitute irreparable harm where no remedy is available at the conclusion of litigation." *See* Pls.' Mot. 28 (quoting *Mountain Valley Pipeline, LLC v. W. Pocahontas Properties Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019)). But the mere fact that unrecoverable economic damages *may* constitute irreparable harm does not mean that *any* unrecoverable economic damages will constitute irreparable harm.[12] *Otsuka Pharm. Co. v. Burwell*, 2015 WL 1962240, at *11 (D. Md. Apr. 29, 2015) ("That [plaintiff] is unable to recover monetary damages from [Defendants] does not . . . automatically make [its] harm irreparable."). "Instead, courts that have evaluated cases involving a company's irretrievable monetary losses typically find irreparable harm only where the monetary losses are so severe that they threaten the very existence of the company." *Otsuka*, 2015 WL 1962240, at *11; *see also Sociedad Anonima Viña Santa Rita v. U.S. Dep't of Treasury*, 193 F. Supp. 2d 6, 14 (D.D.C. 2001). Thus, a party seeking injunctive relief on the basis of unrecoverable economic harm must still show that such harm is significant enough to justify the relief sought.[13] "Otherwise, a litigant seeking injunctive relief against the government would always

---

[12] Indeed, even in the cases cited by Plaintiffs, courts often look to see the extent of the unrecoverable damages before deciding whether the threshold is met for irreparable harm. *See, e.g.*, *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) (Scalia, J., in chambers) (noting that "a substantial portion" of the funds at issue "will be irrevocably expended" before the Court can resolve the claims before it); *Lawrence & Mem'l Hosp. v. Sebelius*, 986 F. Supp. 2d 124, 133 (D. Conn. 2013) (discussing the extent of the loss at issue). In *Mountain Valley Pipeline*, the party seeking an injunction "set forth evidence that it would suffer *significant* unrecoverable financial damages . . . in the absence of an injunction." 918 F.3d at 366 (emphasis added).

[13] Plaintiffs do cite one district court decision from this circuit holding that "any loss of income suffered by a plaintiff is irreparable per se," but that view is far from universal. Pls.' Mot. 28 (quoting *Children's Hosp. of the King's Daughters, Inc. v. Price*, 258 F. Supp. 3d 672, 690 (E.D. Va. 2017)). That opinion borrowed the "per se" language from another district court decision, *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008) (Walton, J.). But that same court later held that the *per se* characterization "goes too far" and "the inability to recover economic losses can more accurately be

satisfy the irreparable injury prong, nullifying that requirement in such cases." *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 49 (D.D.C. 2014).

This standard has been applied to Medicaid providers in the Ninth Circuit, which held that such providers must show that they "will lose considerable revenue through the reduction in payments that they will be unable to recover" due to sovereign immunity. *Cal Pharmacists Ass'n v. Maxwell-Jolly ("Cal. II")*, 596 F.3d 1098, 1113-14 (9th Cir. 2010), *vacated & remanded sub nom*, *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012). And notwithstanding the *per se* rule articulated in *Children's Hospital*, that court also investigated the extent of the purported harm and determined that, in the absence of the injunction, the plaintiff hospital could "violat[e] its bond covenants, which could force [the hospital] to accelerate repayment of over $100 million in long-term debt, a financial catastrophe which would threaten [the hospital's] existence." *Children's Hospital*, 258 F. Supp. 2d at 690.

Although the health care provider declarations in this action predict drastic, immediate consequences of the Rule, they offer little concrete evidence that those circumstances will come to pass on January 1, 2021, or that they constitute the sort of existential threat that constitutes irreparable harm. It is true that lower reimbursement rates for drugs subject to the Rule will go into effect on January 1, 2021, but it does not necessarily follow that these decreased reimbursement rates will be so catastrophic that health care providers will have no option but to cease providing these drugs to Medicare beneficiaries on day one or to shutter their clinics entirely. Thus, it is not enough for Plaintiffs to offer declarations that contain conclusory claims that an organization "cannot afford to sustain" losses resulting from the MFN Rule without any tangible information about the extent of the anticipated losses or for how long the provider can afford to sustain those losses. *See, e.g.*, Ex. K, Decl. of Christian Downs, ¶ 9, ECF No. 24-14; Ex. O, Decl. of Dr. Steven Baak, ¶ 10, ECF No. 24-18; Ex. Q, Decl. of Edwin Charles Schadewald, ¶¶ 13-14, ECF No. 24-20; Ex. P, Decl. of Brian Nyquist, ¶ 16, ECF No. 24-19; Ex. S, Decl. of Dr. Laszlo Lipot Mechtler, ¶ 7, ECF No. 24-22; Ex. U, Decl. of Thomas Gallo, ¶ 9, ECF No. 24-24.

---

considered as a factor in determining whether the movant has shown irreparable harm." *ConverDyn*, 68 F. Supp. 3d at 49 (Walton, J.).

One declaration by the US Oncology Network attempts to estimate the costs of the Rule for its members (*see* Ex. M, Decl. of Dr. Michael Seiden, ¶¶ 16-18, ECF No. 24-16), but those figures reflect losses over the course of an entire year, "and therefore give[] the Court little insight into the magnitude of [their] loss during the pendency of this case." *CoverDyn*, 68 F. Supp. 3d at 47; *cf. Children's Hospital*, 258 F. Supp. 3d at 680 (absent preliminary relief, hospital would have been required to repay \$19.1 million at issue within thirty-three days).[14]

Plaintiffs also argue that they will "suffer 'irreparable injury' when they are 'constrained to alter their medical advice to, and medical care of, and their patients contrary to their best judgments.'" Pls.' Mot. 29 (quoting *Mayor & City Council of Baltimore*, 392 F. Supp. 3d at 618). But that argument goes too far. The Secretary "is responsible for administering the Medicare and Medicaid Services program through CMS." *Adventist Healthcare, Inc. v. Sebelius*, 2010 WL 3038917, at \*1 (D. Md. July 30, 2010). Accordingly, the Secretary often promulgates regulations that may alter the incentives for providing particular treatment—and thus, in Plaintiffs' mind, "constrain[]" health care providers. Plaintiffs' reasoning would essentially eliminate the "irreparable harm" requirement for virtually any litigant seeking to enjoin a regulation that impacts the Medicare reimbursement process.

### C. Plaintiffs Have Not Shown That Pharmaceutical Manufacturers Will Experience Immediate, Non-Speculative Harm In the Absence of Preliminary Relief.

Plaintiffs have also failed to demonstrate that pharmaceutical manufacturers will suffer "actual and imminent" harm in the absence of preliminary relief. *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991). Plaintiffs contend that PhMRA members "project massive revenue losses as a result of the MFN Rule," and that some companies anticipate losses of "hundreds of millions of dollars in 2021 alone." Pls.' Mot. 31-32. But it is not enough to demonstrate that these

---

[14] Some declarations appear to take an even longer view. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Neither declarant explains how they reached that figure, nor do they identify the specific drugs at issue or the timeframe that they are taking into account. However, the Rule provides that the MFN Price is phased in over several years, However, the Rule provides that the MFN Price is phased in over several years, and in 2021, the model tests drug payments that will continue to be based on 75% of the market-based payment rates provided for in § 1395w-3a. The percentage may be different in certain narrowly prescribed cases, as specified in the Rule. *See* 42 C.F.R. § 513.210(d)(3).

companies will make less money as a result of the Rule.  Rather, Plaintiffs must demonstrate that their members stand to lose a *significant* amount of money (such that it threatens their very existence) *in the absence of preliminary relief.*  Plaintiffs have not done so here.

As an initial matter, many of Plaintiffs' declarations from pharmaceutical companies fail to provide concrete numbers regarding their anticipated losses.  *See, e.g.,* ███████████████████ ██████  Instead, these declarations primarily rely on anticipated decreases in reimbursement.  *See, e.g.,* █████████████████████████████████.  But Plaintiffs stop short of explaining whether manufacturers will bear the entire cost of those decreases or describing how such costs will impact their bottom line.  *See, e.g.,* █████████████████████████████████████  The declarations are similarly vague with respect to the extent of estimated losses attributable to "lost market share" and "lower overall utilization."  Pls.' Mot. 31.  Thus, plaintiffs have not met their burden to show that the absence of preliminary relief will cause irreparable harm that is sufficient to threaten the manufacturers' continued existence.  And there is reason to believe that even the "significant" losses claimed by the pharmaceutical manufacturers will not threaten the manufacturers' existence.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████ ███████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████[16]  These losses "do not rise to the level of irreparable harm."  *ConverDyn*, 68 F. Supp. 3d at 48-49; *see also Ariz. Hosp. & Healthcare Ass'n v. Betlach*, 865 F. Supp. 2d 984, 1000 (D. Ariz. 2012) ("The Court simply cannot conclude that losses amounting to a small fraction of one percent of

---

[15] *See* ███████████████████████████████.  "SEC forms such as . . . Form 10-K are matters of public record and may be subject to judicial notice."  *Wynn v. Chanos*, 75 F. Supp. 3d 1228, 1235 (N.D. Cal. 2014); *see also Paskowitz v. Arnall*, 2019 WL 3841999, at *10 (W.D.N.C. Aug. 15, 2019).

[16] ████████████████████████████████████████████████.

revenues 'constitute considerable revenues' for these hospitals.").

Moreover, to the extent the manufacturers describe their anticipated losses with any specificity, they focus on anticipated losses during the course of 2021 (or over an even longer time frame). *See, e.g.*, Ex. C ¶ 28; Ex. G ¶ 22. But, as explained above, plaintiffs cannot justify injunctive relief based on anticipated losses over the course of an entire year. Rather, the appropriate question is the extent of losses during the pendency of litigation. Indeed, Plaintiffs' own briefing suggests that pharmaceutical manufacturers' losses will not begin on January 1, 2021. After all, Plaintiffs insist that "there is no way" that manufacturers can adjust their domestic or foreign prices by January 1, 2021 because they sell under "pre-negotiated contracts, which cannot possibly be negotiated within the next three weeks." Pls.' Mot. 30. Thus, there is at least some delay before manufacturers will need to lower their prices to account for the Rule.

Plaintiffs' arguments based on reductions in research and development are even less persuasive. While a decrease in research and development may be harmful, it only constitutes irreparable harm where it is "actual" and "imminent." But the declarations submitted by pharmaceutical manufacturers do not meet that standard. At most, the declarations suggest that, at some point in the future, the pharmaceutical companies would need to assess whether it makes sense to continue some clinical trials in light of the MFN Rule. *See, e.g.*, Ex. B ¶ 17. To the extent that the declarations state that manufacturers *will* need to reduce research and development, they still stop short of stating *when* those decisions will need to be made, or why such decisions cannot wait while this Court evaluates the MFN Rule in the normal course.

At best, Plaintiffs have "shown only the mere possibility of future harm," and therefore have not established that they are likely to suffer irreparable harm absent a temporary restraining order.

### D. Plaintiffs Have Not Shown Irreparable Harm Based on a Lack of Advance Notice and Comment.

Plaintiffs are not entitled to a temporary restraining order based on the purported deprivation of a "procedural right" to comment on the Rule before its promulgation. As an initial matter, HHS had good cause to forgo advance notice and comment procedures. *See* Part I.B.i, *supra*. Accordingly,

Plaintiffs have not demonstrated any deprivation of a procedural right. Moreover, even if Plaintiffs *did* have a pre-promulgation right to comment on the Rule, procedural injury alone would not constitute the type of irreparable harm necessary to sustain a temporary restraining order. After all, if Plaintiffs ultimately prevail on their notice-and-comment claim, any procedural harm would be ameliorated through the ordinary litigation process. Thus, to justify the issuance of preliminary relief, Plaintiffs must show that "unless the [Rule] is enjoined," they are "likely to experience not just *some* injury, but *irreparable harm* that cannot be cured by ultimate success on the merits in this case." *N. Mariana Islands v. U.S.*, 686 F. Supp. 2d 7, 17 (D.D.C. 2009). Plaintiffs have not made that showing.

### E. Plaintiffs Have Not Demonstrated Irreparable Harm Based On A Constitutional Injury.

Plaintiffs also claim that the Rule's alleged "unconstitutionality" is sufficient to establish irreparable harm on its own, but that argument lacks merit. First, as explained above, the MFN Rule is constitutional. *See* Part I.B.iii-iv, *supra*. Setting the merits aside, Plaintiffs have not alleged the type of deprivation contemplated by the authorities they cite—i.e., the deprivation of an individual constitutional right. *See Ross v. Meese*, 818 F.2d 1132, 1134 (4th Cir. 1987) ("[P]laintiff has alleged a violation of her Fourth Amendment rights and at least a colorable claim of a violation of other rights" under the First and Sixth Amendments); 11A Charles Alan Wright & Arthur P. Miller, *Federal Practice & Procedure* § 2948.1 (3d ed.) ("When an alleged deprivation of a constitutional right is involved, *such as the right to free speech or freedom of religion*, most courts hold that no further showing of irreparable injury is necessary.") (emphasis added)' *see also id.* at nn.24-26 (collecting cases involving constitutional rights). Rather, Plaintiffs have alleged structural constitutional claims involving the Presentment Clause and the non-delegation doctrine. *See* Pls.' Mot. 19-22. "[W]hile a violation of constitutional rights can constitute *per se* irreparable harm, . . . *per se* irreparable harm is caused only by violations of 'personal' constitutional rights . . . to be distinguished from provisions of the Constitution that serve 'structural' purposes, like the Supremacy Clause." *N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health*, 545 F. Supp. 2d 363, 367 (S.D.N.Y. 2008), *rev'd on other grounds*, 556 F.3d 114 (2d Cir. 2009); *Pub. Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 382 (1st Cir. 1987); *Am. Petroleum Inst. v. Jorling*, 710 F. Supp. 421,

431 (N.D.N.Y. 1989). Because Plaintiffs have not even alleged, let alone demonstrated, that they were deprived of a personal constitutional right, they cannot rely on that nonexistent constitutional injury to establish irreparable harm.

## III. THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST THE REQUESTED INJUNCTION.

The balance of hardships and the public interest weigh against issuing an injunction here. Where the government is a party, these two inquiries merge. *Nken v. Holder*, 556 U.S. at 435. "[T]here is inherent harm to an agency in preventing it from enforcing regulations that Congress found to be in the public interest to direct that agency to develop." *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008); *Seaside Civic League, Inc. v. U.S. Dep't of Housing & Urban Dev.*, 2014 WL 2192052, at *3 (N.D. Cal. 2014). As the Rule explains, "[h]igh drug prices in the U.S. have serious economic and health consequences for beneficiaries in need of treatment." 85 Fed. Reg. 76,249. It is in the public interest for the Government to take steps to reduce those burdens—particularly where, as here, the Secretary has determined that "[t]he COVID-19 pandemic has rapidly exacerbated these problems" (*id.*), and the Rule is urgently needed to mitigate those consequences. *See* Part I.B.i *supra*.

Finally, although it is true that upholding constitutional rights is in the public interest (Pls.' Mot. 35), Plaintiffs have not asserted a violation of their own constitutional rights in this case. *See* Part I.B.iii-iv, *supra*. Thus, any alleged constitutional violations are irrelevant to this inquiry.

## IV. ANY INJUNCTIVE RELIEF SHOULD BE LIMITED TO THE PLAINTIFFS.

At a minimum, any temporary restraining order should be no broader than necessary to provide Plaintiffs relief. Plaintiffs appear to seek nationwide relief, notwithstanding the fact that nationwide injunctions are "legally and historically dubious." *Trump v. Hawaii*, 138 S. Ct. 2392, 2429 (2018) (Thomas, J., concurring). "[A] plaintiff's remedy must be tailored to redress *the plaintiff's* particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1921, 1933-34 (2018); *see also Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (explaining that an injunction should "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"). These principles apply with even greater force to a temporary restraining order, which is intended to "protect

the status quo and to prevent irreparable harm during the pendency of a lawsuit" until the court is able to "render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). But Plaintiffs have offered no explanation why a nationwide injunction is necessary to redress their alleged injuries.

Nationwide relief would be particularly harmful here given that other plaintiffs have filed lawsuits in district courts in California, New York, and the District of Columbia challenging the Rule. *Biotechnology Innovation Org. v. Azar*, No. 3:20-cv-08603 (N.D. Cal.); *Regeneron Pharm., Inc. v. Azar*, No. 7:20-cv-10488 (S.D.N.Y.); *Community Oncology Alliance, Inc. v. Azar*, No. 1:20-cv-03604 (D.D.C.). If the government prevails in these other jurisdictions, it would render those victories meaningless as a practical matter. It would also preclude appellate courts from testing Plaintiffs' factual assertions against the MFN Rule's operation in other jurisdictions. *See Dep't of Homeland Security v. New York*, 140 S. Ct. 599, 600 (2020) (Mem.) (Gorsuch, J., concurring) ("The traditional system of lower courts issuing interlocutory relief limited to the parties at hand . . . . encourages multiple judges and multiple circuits to weigh in only after careful deliberation, a process that permits the airing of competing views that aids this Court's own decisionmaking process."); *cf. California v. Azar*, 911 F.3d 558, 583 (9th Cir. 2018) (recognizing that "nationwide injunctive relief may be inappropriate where a regulatory challenge involves important or difficult questions of law, which might benefit from development in different factual contexts and in multiple decisions by the various courts of appeals").

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a temporary restraining order and preliminary injunction should be denied.

Dated: December 15, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

MICHELLE R. BENNETT
Assistant Branch Director

s/*Rachael L. Westmoreland*
RACHAEL L. WESTMORELAND
ALEXANDRA R. SASLAW
LISA N. NEWMAN
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC  20044
Phone: (202) 514-1280
rachael.westmoreland@usdoj.gov

Attorneys for Defendants