# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

---

ASSOCIATION OF COMMUNITY CANCER
CENTERS, *et al.*,

        *Plaintiffs*,

    v.

ALEX M. AZAR II, in his official capacity as Sec-
retary of the U.S. Department of Health and Human
Services, *et al.*,

        *Defendants*.

Civil Action No. 1:20-cv-03531-CCB

---

## REPLY IN SUPPORT OF PLAINTIFFS' MOTION
## FOR A TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................. 3

I.      EVERY EQUITABLE FACTOR STRONGLY SUPPORTS ISSUING A TRO ............. 3

         A.     Patients, Healthcare Providers, and Pharmaceutical Manufacturers Will Suffer Enormous Irreparable Harm Absent a TRO .......................................................... 3

         B.     The Balance of Equities and Public Interest Strongly Support a TRO ................... 9

II.     PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS .................................... 10

         A.     This Court Has Jurisdiction ................................................................................. 10

         B.     Plaintiffs Are Likely to Prevail on the Merits ...................................................... 17

CONCLUSION ............................................................................................................. 20

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Chiropractic Ass'n, Inc. v. Leavitt*,
    431 F.3d 812 (D.C. Cir. 2005) ..............................................................................11

*Am. Hosp. Ass'n v. Azar*,
    964 F.3d 1230 (D.C. Cir. 2020) ............................................................................14

*Am. Lithotripsy Soc. v. Thompson*,
    215 F. Supp. 2d 23 (D.D.C. 2002) ........................................................................11

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
    559 F.3d 1046 (9th Cir. 2009) ................................................................................9

*Amgen, Inc. v. Smith*,
    357 F.3d 103 (D.C. Cir. 2004) ........................................................................13, 14

*Arriva Med. LLC v. U.S. Dep't of Health & Human Servs.*,
    239 F. Supp. 3d 266 (D.D.C. 2017) .......................................................................9

*Baxter Healthcare Corp. v. Weeks*,
    643 F. Supp. 2d 111 (D.D.C. 2009) ..................................................................3, 12

*Bond v. United States*,
    564 U.S. 211 (2011) ................................................................................................9

*Bowen v. Michigan Academy of Family Physicians*,
    476 U.S. 667 (1986) ..............................................................................................11

*California v. Health & Human Servs.*,
    281 F. Supp. 3d 806 (N.D. Cal. 2017) ...................................................................8

*Chamber of Commerce v. DHS*,
    2020 WL 7043877 (N.D. Cal. Dec. 1, 2020) ..................................................17, 18

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ...............................................................................7

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ..............................................................................................19

*Council for Urological Interests v. Sebelius*,
    668 F.3d 704 (D.C. Cir. 2011) .............................................................................11

*Cumberland Cnty. Hosp. Sys., Inc. v. Burwell*,
    816 F.3d 48 (4th Cir. 2016) ..................................................................12

*Fresno Cmty. Hosp. & Med. Ctr. v. Azar*,
    370 F. Supp. 3d 139 (D.D.C. 2019) ....................................................16

*INS v. St. Cyr*,
    533 U.S. 289 (2001) ...........................................................................10

*ITT Cmty. Dev. Corp. v. Barton*,
    569 F.2d 1351 (5th Cir. 1978) .............................................................12

*Jordan v. U.S. Dep't of Justice*,
    591 F.2d 753 (D.C. Cir. 1978) .............................................................18

*Leedom v. Kyne*,
    358 U.S. 184 (1958) ...........................................................................15

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
    915 F.3d 197 (4th Cir. 2019) .................................................................6

*N. Mariana Islands v. United States*,
    686 F. Supp. 2d 7 (D.D.C. 2009) ..........................................................9

*National Athletic Trainers' Association, Inc. v. HHS*,
    455 F.3d 500 (5th Cir. 2006) ...............................................................12

*NFIB v. Sebelius*,
    567 U.S. 519 (2012) .............................................................................2

*North Oaks Med. Ctr., LLC v. Azar*,
    2020 WL 1502185 (E.D. La. Mar. 25, 2020) .....................................16

*Porzecanski v. Azar*,
    943 F.3d 472 (D.C. Cir. 2019) .............................................................10

*Ralls Corp. v. CFIUS*,
    758 F.3d 296 (D.C. Cir. 2014) .............................................................15

*SH Franchising, LLC v. Newlands Homecare, LLC*,
    2019 WL 356658 (D. Md. Jan. 29, 2019) .............................................7

*Shalala v. Ill. Council on Long Term Care, Inc.*,
    529 U.S. 1 (2000) .........................................................................11, 16

*Singleton v. Wulff*,
    428 U.S. 106 (1976) .............................................................................5

*Southwest Airlines Co. v. TSA*,
    554 F.3d 1065 (D.C. Cir. 2009) ........................................................................14

*Yale New Haven Hosp. v. Azar*,
    409 F. Supp. 3d 3 (D. Conn. 2019) ..................................................................16

**Statutes**

5 U.S.C.
    § 553(b)(3)(B) ................................................................................................16
    § 705 ...............................................................................................................13

42 U.S.C.
    § 405(h) .................................................................................................. *passim*
    § 1315a ................................................................................................... *passim*
    § 1395ff .......................................................................................................1, 10
    § 1395ii ...........................................................................................................10
    § 1395*l*(t)(12)(A) ...........................................................................................13

**Rules & Regulations**

85 Fed. Reg. 76,180 (Nov. 27, 2020) ..................................................................... *passim*

Fed. R. Civ. P. 65(b)(2) ..............................................................................................2

**Legislative Materials**

Administrative Procedure Act: Legislative History, S. Doc. No. 79-248 (1946) .........................13

**Other Authorities**

A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .........................18

J. Hohmann, *The Daily 202: Government Experts Warn of a Second Wave of
    Coronavirus Cases, as the Health System Struggles*, Wash. Post (Mar. 26,
    2020) ..............................................................................................................17

11A Wright & Miller, *Federal Practice & Procedure* § 2951 (2005) ...........................................2

# INTRODUCTION

One can hardly imagine a clearer case for a temporary restraining order. Plaintiffs' Motion attaches 21 declarations, and this reply three more—from pharmaceutical companies, provider groups, a hospital association, a patient group, and a prominent health economist, along with a letter from oncologists whose practices treat 625,000 Medicare patients—attesting to the severe and irreversible harms that implementing the MFN Rule will cause starting on January 1. Those declarations show that, starting on day one, oncologists, neurologists, and other providers who rely on MFN-covered products will be forced to stop treating Medicare patients, to consolidate their practices, to shut their doors altogether, or to switch patients to sub-optimal treatments with immediate, severe, and permanent consequences for patient health. Practices and pharmaceutical companies will meanwhile lose billions of dollars that can never be recovered. Incentives to innovate will be instantly stifled, reducing the supply of innovative new drugs.

The government does not seriously contest any of these or other devastating harms. Rather, the government quibbles with exactly how large those losses will be and exactly when they will hit, notwithstanding Plaintiffs' detailed declarations attesting that the losses are massive and are *already* affecting Plaintiffs. Moreover, and in stark contrast, the government identifies no substantial harm that would result if the *four-year* phase-in of its *seven-year* "test" were delayed for a short period of time, or at least until this Court can consider a preliminary injunction. The government merely asserts that the MFN Rule will at some unspecified future date indirectly reduce the out-of-pocket costs of the small percentage of seniors who lack supplemental insurance covering copayments. On this record, the balance of harms and public interest clearly favor granting a TRO.

Sidestepping the equities and merits, the government principally argues that this Court lacks jurisdiction. The government first asserts that 42 U.S.C. §§ 405(h) and 1395ff require Plaintiffs to present a reimbursement claim to HHS before asserting a claim *arising under the Medicare*

*statute*. But Plaintiffs' challenges arise under Section 1115A, which is in another subchapter not subject to any presentment requirement. Plaintiffs, in any event, could not present a reimbursement claim given the obstacles present in these circumstances. The government also invokes Section 1115A's judicial-review bar, but as explained in Plaintiffs' moving papers, that provision precludes only review of certain enumerated decisions related to a bona fide "test" of a "model," which the MFN Rule is not.

On the merits, the government simply cannot overcome the basic facts: The MFN Rule is a "transformative" new national drug pricing policy, *Remarks by President Trump at Signing of Executive Orders on Lowering Drug Prices* (July 24, 2020), https://bit.ly/37zwGJt [July 2020 Remarks], promulgated in the outgoing Administration's final days in office on the Friday after Thanksgiving, rushed into effect without notice and comment in just five weeks on the asserted basis of a pandemic that has been raging for almost a year, all under the purported authority of a "minor," "ancillary" provision of the Affordable Care Act, *NFIB v. Sebelius*, 567 U.S. 519, 704-05 (2012) (joint dissent). When this case is fully litigated, Plaintiffs are more than likely to demonstrate that the MFN Rule is unlawful on multiple grounds.

For now, however, the Court need not fully resolve these issues. The immediate question is limited to whether a TRO is appropriate to "preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction." 11A Wright & Miller, *Federal Practice & Procedure* § 2951 (2005). For the reasons stated in Plaintiffs' moving papers, and elaborated below so far as the expedited schedule for this reply permits, a TRO is amply warranted here. Moving forward, Plaintiffs stand ready to accommodate whatever schedule will best assist the Court. As the Court recognized at the telephone conference on December 11, there is simply insufficient time for briefing and decision on a preliminary injunction before the Rule's artificial

January 1 effective date, and TROs generally are limited to 28 days' duration absent consent from the restrained party, *see id.*; Fed. R. Civ. P. 65(b)(2). If the government is willing to extend a TRO by consent, Plaintiffs are prepared to reach agreement with the government on a reasonable briefing schedule. If the government will not consent, then Plaintiffs are prepared to move forward with an expedited briefing schedule of the Court's choosing that will enable the Court to resolve Plaintiffs' preliminary injunction motion before the MFN Rule's new reimbursement scheme—along with the massive harms it will cause—is allowed to go into effect.

## ARGUMENT

### I.     EVERY EQUITABLE FACTOR STRONGLY SUPPORTS ISSUING A TRO

#### A.     Patients, Healthcare Providers, and Pharmaceutical Manufacturers Will Suffer Enormous Irreparable Harm Absent a TRO

The MFN Rule will immediately and irreparably injure patients' health by obstructing their access to life-saving and life-enhancing medications. As Plaintiffs explained, long-term contracts have locked providers into buying medicines covered by the MFN regime at prices well above MFN reimbursement rates for months into the future, and those contracts cannot be renegotiated by January 1. To avoid unsustainable losses, providers accordingly will have to stop administering MFN-covered medicines on day one, requiring patients to switch immediately to less beneficial alternatives or to seek treatment in distant, crowded, COVID-19-ravaged safety-net hospitals. Mem. 15, 25-27. None of this is disputed: The Rule itself acknowledges that patients will lose access "by having to find alternative care providers locally, having to travel to seek care from an excluded provider, receiving an alternative therapy that may have lower efficacy or greater risks, or postponing or forgoing treatment," and that the rate at which patients at non-safety-net providers have "No Access" to covered medications will jump by 9% in 2021 alone. 85 Fed. Reg. at 76,237.

It cannot be overstated how important MFN-covered medications are to the patients who take them. These 50 medicines are used the most because they are the best in physicians' eyes. Patients denied access will suffer "rebound disease activity" and "permanent neurological damage" within *weeks*, Ex. N, ¶¶ 7, 11; "cognitive degeneration, blindness, an inability to walk or stand, irreparable damage to the gastrointestinal tract and joints, permanent disability, and other losses of bodily autonomy," Ex. P, ¶ 17; "disruption in end-of-life care," Ex. S, ¶ 8; and reduced life-expectancy and death, Ex. M, ¶ 21-22. *See also* Ex. L, ¶ 12; Ex. O, ¶¶ 12-13; Ex. Q, ¶ 15; Ex. R, ¶¶ 14-15; Ex. X, ¶ 8. These harms indisputably cannot be remedied absent interim relief.

The government instead argues that these life-threatening harms to patients are irrelevant because Plaintiffs cannot obtain a TRO based on irreparable injuries to "third parties." Opp. 26. But Plaintiff Global Colon Cancer Association (GCCA) is a *patient* organization. *See* Compl. ¶ 16; Ex. L, ¶ 4. Member organizations of the GCCA in turn have members who are patients suffering from colorectal cancer, and those patients' health will be irreparably harmed if the MFN Rule's new reimbursement scheme goes into effect. Mem. 27; *see* Ex. L, ¶¶ 4, 8-9. The government's argument about irreparable harm to "third parties" is thus flawed in even its basic premise.

Even apart from GCCA, Plaintiffs the Association of Community Cancer Centers (ACCC) and National Infusion Center Association (NICA) independently have standing to assert the irreparable injuries of their members' patients. The government argues (Opp. 27-28) that ACCC and NICA cannot obtain a TRO based on harms to patients because "Plaintiffs have identified no … obstacles hindering their patients' ability to vindicate their own rights through court proceedings." But those obstacles are obvious. A patient suffering from cancer, multiple sclerosis, or another serious disease would have to: (1) read the 79-page Federal Register notice published the day after Thanksgiving; (2) realize that the MFN Rule will require her provider either to shut its doors or to

switch her to alternative treatments; (3) anticipate that the alternative treatment her own doctor would offer is less safe or effective, and that other providers are unavailable or inconvenient; (4) file a lawsuit; and (5) move for a TRO and a preliminary injunction—all in time to enjoin the MFN Rule before January 1. If preliminary relief is not granted, many patients would suffer setbacks that would make it difficult to continue in the litigation. Ex. V, ¶ 9. Those obstacles are at least as "insurmountable" as the obstacles that "allow a physician to assert the rights of … patients as against governmental interference with [an] abortion decision." Opp. 27 (quoting *Singleton v. Wulff*, 428 U.S. 106, 118-19 (1976)). And in addition to these practical obstacles, patients who suffer from serious diseases like cancer or multiple sclerosis may *also* "be chilled from [litigation] by a desire to protect the very privacy of [their treatment] from the publicity of a court suit." *Singleton*, 428 U.S. at 117. Finally, many of ACCC's and NICA's members have longstanding relationships with their patients, some of whom have received care from the same provider for more than 20 years. Ex. W, ¶ 3; Ex. X, ¶ 3. These healthcare providers are more than adequate substitutes for the patients on whose behalf they are advocating. *See id.* at 115.

In addition to patients, the MFN Rule will also irreparably harm healthcare providers themselves by forcing them to (1) shut down, (2) incur staggering losses, or (3) prescribe alternative therapies not covered by the MFN regime, even if those alternative therapies are not as safe or effective. Mem. 27-30. The government concedes (Opp. 28) that to the extent the MFN Rule "threatens the very existence" of a provider's practice, the harm is irreparable. The government nonetheless asserts (Opp. 29) that Plaintiffs lack "information about the extent of the anticipated losses or for how long the provider can afford to sustain those losses." But the government ignores Plaintiffs' declarations showing numerous, specific providers at serious risk of shutting down in January 2021. For example, an infusion network operating in Montana, Idaho, and Colorado,

which has "a profit margin of less than two percent," will have only a "marginal[] … ability to keep its doors open in rural areas," Ex. R, ¶¶ 7, 9; an infusion center in Utah "will either be forced to go out of business or, at the very least, stop servicing its significant population of Medicare patients," Ex. Q, ¶ 14; and oncology practices will incur "staggering losses" that they "may not be able to sustain *for even a month*," Ex. M at 13 (emphasis added). One provider estimates that they will lose $2,000 per administration of a single MFN-covered drug. *See* Ex. V, ¶ 12.

Providers will also be irreparably harmed when they are forced by financial pressure to prescribe their patients alternative therapies not covered by the MFN regime. Mem. 29. The government attempts to minimize this pernicious consequence, noting dismissively (Opp. 30) that "the Secretary often promulgates regulations that may alter the incentives for providing particular treatment." But unlike regular cases where rate adjustments merely "alter the incentives," the very premise of the MFN Rule is that covered drugs will be reimbursed so substantially *below* market costs that massive prescriber losses will force changes to the entire drug industry. July 2020 Remarks. Plaintiffs' declarations make clear that the Rule does not just adjust providers' "incentives" at the margin—it leaves them no choice, "forcing" them, Ex. M at 13; Ex. R, ¶ 13, to change their treatment decisions in ways that contravene their medical judgment and "arguably amount[] to malpractice," Ex. N, ¶ 6; *see* Ex. O, ¶ 12. Two infusion centers, for example, will be forced to stop administering Ocrevus—the *only* drug approved for treating primary progressive multiple sclerosis—to their Medicare patients. Ex. W, ¶¶ 5-6; Ex. X, ¶ 4. The government identifies no case where such a profound intrusion on professional conscience and patient safety was deemed tolerable.

Even insofar as providers merely incur monetary losses, the government does not dispute that its sovereign immunity renders those losses unrecoverable. Mem. 28. The government instead argues that even those losses should not count as "irreparable." That makes little sense. Irreparable

harm "*mean[s]*" harm that "cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (emphasis added; citation omitted). Because unrecoverable economic losses cannot be "rectified by the final judgment," they are by definition "irreparable."

The cases the government cites (Opp. 28-29 & nn.12-13) are inapposite and unpersuasive. Many simply discuss the magnitude of the unrecoverable economic loss at issue without ever suggesting that unrecoverable economic loss must be of a particular size in order to count as irreparable. The only cases suggesting that unrecoverable economic losses *must* rise to a certain magnitude appear to come from the D.C. District Court (or to rely solely on cases from that jurisdiction), but the D.C. Circuit has set a notoriously "high standard for irreparable injury," including that "the injury must be … great" in size, *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quotation marks omitted). Fourth Circuit precedent, by contrast, contains no similar requirement; indeed, this Court has previously recognized that "monetary damages" can be "irreparable" even when they are theoretically recoverable but "difficult to ascertain," as the losses here indisputably are. *SH Franchising, LLC v. Newlands Homecare, LLC*, 2019 WL 356658, at *5 (D. Md. Jan. 29, 2019) (citation omitted). Concerns about the size of Plaintiffs' unrecoverable economic losses accordingly go at most to the Court's discretionary balancing of the relevant factors, not to whether the threshold irreparable harm requirement has been satisfied. Even the government's own out-of-circuit authority concedes that "the inability to recover economic losses" is at least "a factor in determining whether the movant has shown irreparable harm." Opp. 28-29 n.13 (citation omitted).

As to pharmaceutical manufacturers, the government offers no evidence to rebut that the MFN Rule will cause enormous losses—for some companies, hundreds of millions of dollars in

2021 alone. Mem. 30-31. Instead, while conceding "large number[s]" of totally unrecoverable losses, the government reiterates its erroneous argument that economic losses must threaten the movant's very "existence." Opp. 31. The government also complains—richly—that some (but not all) manufacturer declarations do not contain precise dollar figures or disclose exactly how manufacturers will respond to the Rule, even though CMS promulgated it *less than two weeks* before the declarations were signed. And the very difficulty in estimating losses with precision is yet another factor supporting interim relief. *SH Franchising*, 2019 WL 356658, at *5. Finally, the government asserts that "some delay" will occur "before manufacturers will need to lower their prices to account for the Rule." Opp. 32. That statement is impossible to square with the government's assertion that the immediate need to reduce copayments during the COVID-19 surge justifies rushing the Rule through without notice and comment. Regardless, as explained, in order to stay afloat, providers will start reducing their prescribing of MFN-covered drugs immediately, and they will also start seeking rebates from manufacturers. *See* Ex. G, ¶¶ 27-29.

The government also does not dispute that the MFN Rule will require manufacturers to reevaluate and reduce their research and development investments. Mem. 31-32. The government asserts that it is unclear "*when* those decisions will need to be made, or why such decisions cannot wait." Opp. 32. But Plaintiffs' declarations clearly state that research and development decisions are made on an ongoing basis, based on "the expected net *present* value of the investment," which continuously takes account of all future effects. Ex. J, ¶ 66 (emphasis added); *see, e.g.*, Ex. A, ¶¶ 49-65; Ex. B, ¶ 17; Ex. C, ¶¶ 33-34; *see also* Ex. J ¶ 75 (Congressional Budget Office recognizing that reference pricing would "immediately [lower] current and expected future revenue for drug manufacturers). Ex. J ¶ 75. The delayed innovation from these lost investments is neither quantifiable nor recoverable through money damages.

Beyond these harms to individual Plaintiffs, the MFN Rule will also irreparably harm *all* Plaintiffs by violating their procedural and constitutional rights. Mem. 32-34. Courts have held that a violation of an affected party's notice-and-comment rights is irreparable so long as the party has some "immediate" interest "at stake," *California v. Health & Human Servs.*, 281 F. Supp. 3d 806, 829 (N.D. Cal. 2017), *aff'd in part, vac'd in part on other grounds*, 911 F.3d 558 (9th Cir. 2018), or at a minimum where the regulation "will dramatically alter" a "complex and far-reaching regulatory regime" and the affected party has articulated "meaningful concerns," *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 17 (D.D.C. 2009). The government responds (Opp. 33) that, "if Plaintiffs ultimately prevail on their notice-and-comment claim, any procedural harm would be ameliorated through the ordinary litigation process." Whatever that means, it seems to imply that a notice-and-comment violation is *never* irreparable—a proposition the case law squarely rejects. The government also claims that constitutional violations are only irreparable when "personal" rather than "structural" rights are at issue. Opp. 33-34. But "[t]he structural principles secured by the separation of powers protect the individual as well," *Bond v. United States*, 564 U.S. 211, 222 (2011), and courts have found irreparable harm based on structural violations. *See Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058-59 (9th Cir. 2009).

## B.     The Balance of Equities and Public Interest Strongly Support a TRO

As a counterweight to all of the irreparable harms just described, the government identifies no substantial harm were this Court to enter a brief TRO. The MFN Rule is a *seven-year* "test" of a new reimbursement "model," with a *four-year* phase-in period. Mem. 10. If this Court enters a TRO but later denies a preliminary injunction, the consequence would be that the MFN regime will be fully phased-in starting mid-to-late January 2024 (instead of January 1, 2024), and the MFN "test" will conclude mid-to-late January 2028 (instead of December 31, 2027). Such small

delays of regulatory timelines stretching years into the future pale in comparison to the immediate and irreparable suffering patients, providers, and manufacturers will experience right now.

Moreover, even if harm to patients' health could somehow be ignored for irreparable harm purposes, the law is clear that effects on third parties at least go to the balance of equities and the public interest. *See, e.g., Arriva Med. LLC v. U.S. Dep't of Health & Human Servs.*, 239 F. Supp. 3d 266, 283 (D.D.C. 2017) (collecting authorities). The devastating harms the MFN Rule will inflict on patients alone—let alone in combination with the additional harms to providers and manufacturers—amply show that a TRO is equitable and in the public interest.

## II. PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS

### A. This Court Has Jurisdiction

#### 1. 42 U.S.C. § 405 Does Not Strip this Court of Jurisdiction

The government argues that this Court lacks jurisdiction under 42 U.S.C. § 405, which governs judicial review of administrative decisions under the Social Security program, and 42 U.S.C. § 1395ff, which makes parts of Section 405 applicable to certain decision under Medicare. These provisions do not strip jurisdiction here for three independent reasons.

*First*, by its plain terms, Section 1395ff(b)(1) applies only to appeals from an "initial determination [of benefits] under subsection (a)(1)," which this case plainly is not. More relevant is Section 1395ii, which "incorporates the judicial review scheme set forth in 42 U.S.C. § 405(h)." *Porzecanski v. Azar*, 943 F.3d 472, 480 (D.C. Cir. 2019). Section 1395ii provides that Section 405(h) "shall apply *with respect to this subchapter*"—*i.e.*, subchapter XVIII of the Social Security Act, the Medicare statute. But the agency action Plaintiffs challenge here was *not* taken under the Medicare statute in subchapter XVIII. The government thus correctly acknowledges (Opp. 8) that "Plaintiffs challenge an agency action taken under 42 U.S.C. § 1315a." The government then *incorrectly* asserts (Opp. 8) that Section 1115A of the Social Security Act is "indisputably part of

the Medicare statute." The government's colloquial use of "Medicare" is incorrect. In fact, Section 1115A is indisputably *not* part of the Medicare statute: The Medicare statute is subchapter XVIII; but Section 1115A is part of subchapter XI, which falls outside Section 1395ii's cross reference and is *not* Medicare, but instead is entitled "General Provisions, Peer Review, and Administrative Simplification." The upshot is that the government's lead jurisdictional argument rests on a demonstrable misreading of Section 1115A.

*Second*, even if Section 405(h) applied to subchapter XI, its "channeling requirement is not absolute." *Council for Urological Interests v. Sebelius*, 668 F.3d 704, 707 (D.C. Cir. 2011) (quotation marks omitted). In *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667 (1986), the Supreme Court relied on "the strong presumption that Congress intends judicial review of administrative action" to hold that Section 405 did not preclude a challenge to certain Medicare Part B regulations because it was "implausible to think [that Congress] intended that there be *no* forum to adjudicate statutory and constitutional challenges to regulations promulgated by the [HHS] Secretary." *Id.* at 670, 678; *see Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 17 (2000) (Section 405(h) does not apply "where its application to a particular category of cases ... would mean no review at all"). There is thus an exception to Section 405(h) "not only when administrative regulations foreclose judicial review, but also when roadblocks practically cut off any avenue to federal court." *Am. Chiropractic Ass'n, Inc. v. Leavitt*, 431 F.3d 812, 816 (D.C. Cir. 2005).

Here, there is no way Plaintiffs could avail themselves of the Medicare administrative review scheme. The only entities able to file claims for administrative review are those providers and patients who are unhappy with the reimbursement received for specific drugs that are actually administered. But as noted in Plaintiffs' opening brief, the MFN Rule disincentivizes providers from administering those drugs in the first place. To state the obvious: Providers and patients

cannot submit reimbursement claims for drugs the MFN Rule forces them not to administer. As such, they cannot "access HHS'[s] administrative review process" in this case. *Baxter Healthcare Corp. v. Weeks*, 643 F. Supp. 2d 111, 115 (D.D.C. 2009).

Perhaps even worse, pharmaceutical manufacturers are cut out of the administrative review process entirely. Under the "buy and bill" system, submitting a reimbursement claim and then seeking review is a process available solely to providers. That only providers may seek reimbursement does *not* mean that only providers can challenge Medicare Part B reimbursement regulations; rather, it means that the statute "permit[s] non-providers to seek immediate review in federal court." *Council for Urological Interests*, 668 F.3d at 711. Courts accordingly have allowed plaintiffs that do not "qualify as 'providers'" to invoke a district court's federal-question jurisdiction under § 1331 notwithstanding Sections 405(h) and 1395ii. *Id.* at 707, 713; *see Am. Lithotripsy Soc. v. Thompson*, 215 F. Supp. 2d 23, 30 (D.D.C. 2002). At least one court has applied this principle to a claim by a drug "manufacturer," which "itself could not access HHS'[s] administrative review process." *Baxter*, 643 F. Supp. 2d at 115 (D.D.C. 2009).

Citing *National Athletic Trainers' Ass'n v. HHS*, 455 F.3d 500 (5th Cir. 2006), the government argues (Opp. 8) that the *Illinois Council* exception does not apply where "a third party can assert the claim." But the Fifth Circuit did not hold that judicial review is precluded if *any* third party may submit a reimbursement claim. The court instead considered, in the context of the specific challenge before it, whether the unusually close relationship between athletic trainers and the physicians who "employ" them created an "adequate proxy in the administrative review process." *Id.* at 504-05 (citation omitted). The cooperative employer-employee relationship in *National Athletic Trainers' Ass'n* cannot be fairly analogized to the arm's length manufacturer-provider relationship here. In any event, given the "ten-year backlog" for Medicare reimbursement-claim

appeals, forcing providers to wait through the "incontrovertibly grotesque" administrative process before challenging the MFN Rule would be functionally equivalent to denying judicial review altogether. *Cumberland Cnty. Hosp. Sys., Inc. v. Burwell*, 816 F.3d 48, 49-50 (4th Cir. 2016). And even providers cannot submit claims for drugs the MFN Rule forces them not to administer.

*Third*, even if this Court lacked jurisdiction *now*, "[w]hen potential jurisdiction exists, a federal court may issue status quo orders to ensure that once its jurisdiction is shown to exist, the court will be in a position to exercise it." *ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1359 n.19 (5th Cir. 1978). The APA codifies that power: "[T]o the extent necessary to prevent irreparable injury, the reviewing court … may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. This provision provides a "definitive statutory statement and extension of rights pending review"—*i.e.*, it "amends statutes conferring exclusive authority upon administrative agencies to take or withhold action," in keeping with "what has generally been regarded as an essential and inherent right of the courts." Administrative Procedure Act: Legislative History, S. Doc. No. 79-248, at 369-70 (1946). The Court can thus enter interim relief preserving the status quo, preventing irreparable harm and protecting the Court's eventual ability to enter effective relief. *See Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 562 (D.C. Cir. 2015).

## 2. Section 1115A(d)(2) Does Not Strip this Court of Jurisdiction

Section 1115A's judicial-review bar provides that "[t]here shall be no administrative or judicial review" of certain enumerated decisions. As relevant here, those include "the selection of *models* for *testing*," "the selection of organizations, sites, or participants to *test* those *models*," or "the elements, parameters, scope, and duration *of such models*." 42 U.S.C. § 1315a(d)(2) (emphasis added). None of Plaintiffs' challenges falls within the scope of that bar, because Plaintiffs are challenging whether the MFN Rule even qualifies as a "test" of a "model" in the first place.

Courts have repeatedly reviewed that type of threshold question even in the face of judicial-review bars, on the straightforward logic that "[i]f a no-review provision shields particular types of administrative action, a court … must determine whether the challenged agency action is of the sort shielded from review." *Amgen, Inc. v. Smith*, 357 F.3d 103, 113 (D.C. Cir. 2004) (quotation marks omitted). For example, in *Amgen*, the D.C. Circuit considered a bar that provided, in language identical to Section 1115A's, that "[t]here shall be no administrative or judicial review" of "other adjustments" made under the Secretary's authority to adjust certain Medicare Part B prospective payment rates. 42 U.S.C. § 1395*l*(t)(12)(A). Amgen brought suit, claiming that the Secretary had unlawfully altered a payment rate. CMS claimed that the judicial-review bar precluded the court from reviewing the Secretary's rate alteration, but the D.C. Circuit held that to decide that question, it first needed to determine whether the statute "authorize[d] the type of adjustment the Secretary … made here." 357 F.3d at 113. If the statute did not, then the Secretary had not made an "adjustment[]" within the meaning of the statute *at all*, in which case the judicial-review bar could not apply. *Id.* Thus, "whether the court has jurisdiction is intertwined with the question of whether the agency has authority for the challenged action, and the court must address the merits to the extent necessary to determine whether the challenged agency action falls within the scope of the preclusion on judicial review." *Id.* The D.C. Circuit has repeatedly—and recently—reaffirmed that analysis. *See, e.g.*, *Am. Hosp. Ass'n v. Azar*, 964 F.3d 1230, 1238 (D.C. Cir. 2020) ("[A] jurisdiction-stripping provision does not apply if the agency's action fails to qualify as the kind of action for which review is barred." (cleaned up)); *Southwest Airlines Co. v. TSA*, 554 F.3d 1065, 1071 (D.C. Cir. 2009). The same analysis applies here. Before CMS can invoke Section 1115A's judicial-review bar, this Court must first determine whether the MFN Rule is actually a "test" of a "model," such that the judicial-review bar would even be implicated.

Overlooking this line of caselaw almost entirely,[1] the government instead focuses on whether Plaintiffs can satisfy the different, more demanding *ultra vires* standard of review. Opp. 9-11. But Plaintiffs invoked the *ultra vires* standard in the alternative, Mem. 23-24, so the Court need not reach that issue. But if the Court does rely on the *ultra vires* doctrine, then for the reasons stated in Plaintiffs' motion and below, it is beyond cavil that CMS acted in excess of its delegated powers. *See Leedom v. Kyne*, 358 U.S. 184, 190 (1958); *see also* Mem. 16-19; *infra* Part II.B.

Next, the government argues that Section 1115A's judicial-review bar somehow forecloses Plaintiffs' constitutional challenges as well. Opp. 11-12. But the standard for barring constitutional claims is exacting, requiring "the clearest evocation of congressional intent to proscribe judicial review of constitutional claims in light of the constitutional dangers inherent in denying a forum in which to argue that government action has injured interests that are protected by the Constitution." *Ralls Corp. v. CFIUS*, 758 F.3d 296, 308 (D.C. Cir. 2014) (quotation marks omitted). Nothing in Section 1115A comes close. And "the selection and scope of reimbursement models under the statute," Opp. 11, is separate from whether the statute *itself* is constitutional.[2]

Finally, the government claims that Section 1115A's judicial-review bar prohibits this Court from reviewing CMS's failure to abide by the APA's notice-and-comment requirements,

---

[1] In a footnote, the government mischaracterizes *Amgen*'s discussion as "dicta" because the court "lacked jurisdiction to consider the claim that arose." Opp. 11 n.3. That gets it exactly backwards: the court concluded it lacked jurisdiction over the claim *because* it first held that the claim failed on the merits. *See* 357 F.3d at 113. Compounding the error, the government then argues that the D.C. Circuit somehow "clarified" *Amgen* in *DCH Regional Medical Center*, a case that (1) did not cite *Amgen*, (2) dealt with a different doctrine, and (3) was followed by a decision squarely reaffirming every aspect of *Amgen*'s reasoning, *see Am. Hosp. Ass'n*, 964 F.3d at 1238.

[2] Falling back, the government also attacks Plaintiffs' constitutional claims as "speculative and conclusory allegations … that are essentially characterizations of their challenge to the underlying merits." Opp. 12 (cleaned up). But Plaintiffs' constitutional claims—spanning eight pages and 28 paragraphs of their complaint, Compl. ¶¶ 100-13, 157-70—are hardly "speculative and conclusory"; those claims also invoke different sources of law, rest on different legal theories, and require Plaintiffs to establish different elements than Plaintiffs' statutory claims.

asserting that the procedural question "is 'inextricably intertwined' with the merits of the substantive challenge to the 'selection' of the MFN Model." Opp. 13. But the government conflates two distinct questions: the "selection" of a model (covered by the judicial-review bar) and the model's subsequent promulgation (not covered). Section 1115(d)(2)'s bar on review of "the selection of models for testing" refers back to the exercise of authority under an earlier provision governing the Secretary's substantive discretion to select among different possible models. *See* 42 U.S.C. § 1315a(b)(2) ("Selection of models to be tested"). Whether the agency properly invoked authority under the APA to leapfrog statutory notice-and-comment requirements, 5 U.S.C. § 553(b)(3)(B), is an entirely separate legal question that falls well outside Section 1115A's judicial-review bar.

Courts have thus repeatedly held that judicial-review bars like Section 1115A's do not prohibit challenges to an agency's promulgation processes, even where (unlike here) that promulgation process is part of the same statutory provision. *See, e.g.*, *Yale New Haven Hosp. v. Azar*, 409 F. Supp. 3d 3, 15 (D. Conn. 2019) (under a near-identical judicial-review bar, "review of the <u>promulgation</u> of the Secretary's rules and policies [is] separate from the <u>substance</u> of any such rules or policies"); *North Oaks Med. Ctr., LLC v. Azar*, 2020 WL 1502185, at *9 (E.D. La. Mar. 25, 2020) (similar); *see also Fresno Cmty. Hosp. & Med. Ctr. v. Azar*, 370 F. Supp. 3d 139, 158 (D.D.C. 2019) (permitting APA challenge to HHS Secretary's implementation of statutory scheme despite similarly worded judicial-review bar). In response, the government musters only two inapposite cases involving *channeling* in the Section 405(h) context. *See* Opp. 12-13 (citing *Ringer* and *Illinois Council*). As a textual matter, Section 405(h) differs significantly from Section 1115A. And because those cases involved channeling, they addressed only *when* a claim could be heard, not *whether* the claim could be heard at all (as under Section 1115A). *See Ill. Council*, 529 U.S. at 19. When interpreting a provision barring *all* judicial review for certain issues, as Section 1115A

does, courts must strictly adhere to the statutory text, and presume that items not specifically mentioned (like APA procedural challenges) are not barred from review.

## B. Plaintiffs Are Likely to Prevail on the Merits

Plaintiffs will save a more full rebuttal on the merits for future briefing on a preliminary injunction. Even brief examination, however, exposes the MFN Rule's deep deficiencies.

### 1. The MFN Rule Was Unlawfully Issued Without Notice and Comment

CMS cites (Opp. 15-16) only one purported "emergency" to justify the agency's disregard for standard notice-and-comment procedures: the "new surge in COVID-19 cases." But as discussed in Plaintiffs' motion, *see* Mem. 12-16, that justification falls far short. CMS has not explained the relevance of a "new surge" in cases, given that the purported relief afforded by the Rule is *economic* and the economy is currently at its highest point since March. For that matter, CMS has also not explained why it expects seniors on Medicare to be affected by "unemployment" levels at all, Opp. 14, given that this population is mostly retired. CMS also does not dispute— and, in fact, ignores entirely—that the MFN Rule will have little impact on copays because up to 94% of Medicare Part B patients already have supplemental coverage that reduces or eliminates their cost-sharing obligations. Ex. L, ¶ 24. The government ignores that because providers will likely substitute inferior treatments to avoid losing money on every dose, there will be no reduction in copays. And the government admits that the Rule exempts the one class of treatments actually *designed* to treat COVID-19. Putting that all together, it is hard to imagine a more "significant mismatch of facts" between the purported emergency and the choice to forgo procedural requirements. *Chamber of Commerce v. DHS*, 2020 WL 7043877, at *10 (N.D. Cal. Dec. 1, 2020).

Perhaps most egregiously, CMS has *still* not accounted for its years-long delay in issuing the Rule. The government claims (Opp. 15) it was caught flat-footed by "[t]he constantly changing landscape of the pandemic," even though infectious disease experts warned since spring of a

probable fall spike. *See* J. Hohmann, *The Daily 202: Government Experts Warn of a Second Wave of Coronavirus Cases, as the Health System Struggles*, Wash. Post (Mar. 26, 2020), http://wapo.st/3qVvFo5. Surprises of the government's own making do not count as "good cause." Even if they did, the fact remains that the government could have issued a proposed rule earlier but did not. The point is simple: While "[t]he COVID-19 pandemic is an event beyond Defendants' control, … it was within Defendants' control to take action earlier than they did." *Chamber of Commerce*, 2020 WL 7043877, at *9. The government's failure to contest this point is dispositive.

## 2. The MFN Rule Exceeds CMS's Statutory Authority

The MFN Rule also is not the "test" of a "model" contemplated under Section 1115A. The government tries to erase any meaning those words might have by suggesting that they are "inherently contextual terms, the definition of which will depend on the actor, the product, and the market." Opp. 18. But there is no reasonable definition of "test" or "model" that would allow CMS to issue a mandatory rule, with no control group, affecting the vast majority of Medicare Part B drug reimbursements, "on a multi-year, nationwide basis." Opp. 19. The government's contrary interpretation not only redefines the words "test" and "model," but also drains the rest of Section 1115A of any meaning. For instance, the government identifies no discernible purpose for a Phase II expansion if a *nationwide, 50-drug* MFN Rule can be issued under the Secretary's Phase I authority.

Furthermore, the MFN Rule fails to "address[] a defined population *for which there are deficits in care* leading to [1] poor clinical outcomes or [2] potentially avoidable expenditures." 42 U.S.C. § 1315a (emphasis added). In response, the government argues that it need not demonstrate *any* "deficits in care" because Section 1115A purportedly requires models only to address "a defined population for which there are" *either* (1) "deficits in care leading to poor clinical outcomes" *or* (2) "potentially avoidable expenditures." Opp. 2. But that interpretation flouts basic rules of statutory interpretation, including the series-qualifier and nearest-reasonable-referent canons. *See*

A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 144-153 (2012). Under those canons, a phrase like "potentially avoidable expenditures" is modified by the nearest reasonable series-qualifier, namely, the phrase "deficits in care leading to." *See Jordan v. U.S. Dep't of Justice*, 591 F.2d 753, 764 (D.C. Cir. 1978) (en banc) ("basic rules of English grammar" require interpreting "internal personnel rules and practices of an agency" under the series-qualifier canon such that "internal personnel" modified both "rules" and "practices" of an agency).

Finally, the government does not deny the Administration's statements about what this Rule really is. President Trump could not have been clearer: the MFN Rule is the proudly proclaimed "granddaddy" of "the most far-reaching prescription drug reforms ever issued," July 2020 Remarks, designed to "transform drug pricing forever," *Remarks by President Trump on Delivering Lower Prescription Drug Prices for All Americans* (Nov. 20, 2020), https://bit.ly/3ophZzI [Nov. 2020 Remarks]. It strains credulity that Congress intended Section 1115A's modest "test" authority to be used in this fashion.

### 3. As Interpreted in the MFN Rule, Section 1115A Is Unconstitutional

Plaintiffs are also likely to succeed on the merits of each of their constitutional challenges. First, the MFN Rule violates bicameralism and presentment requirements by producing the "legal and practical effect" of repealing duly enacted laws governing Medicare Part B. The government does not contest the MFN Rule's "practical effect," but it argues that even under the new regime, the provisions waived by the Rule "will continue to maintain 'legal force and effect'" generally. Opp. 21. That misunderstands the relevant standard. In *Clinton v. City of New York*, 524 U.S. 417 (1998), the Supreme Court held that, even though the "canceled provisions" at issue still had "some continuing financial effect on the Government," that effect was not relevant because the President had made the provisions "entirely inoperative *as to appellees*." *Id.* at 441 (emphasis added). Here, the provisions waived by the Rule may still apply elsewhere, but they are "entirely inoperative as

to [*Plaintiffs*]." The government responds that "[t]he Secretary did not act unilaterally to substitute his judgment about Medicare pricing" but "*executed* rather than rejected the will of Congress." Opp. 22-23. That description cannot be reconciled with the admission that the President acted "in the absence of any meaningful legislative support." Nov. 2020 Remarks.

Second, as interpreted by the MFN Rule, Section 1115A reflects an unconstitutional delegation because it provides awesome power but no "intelligible principle" to guide the Secretary's discretion in exercising that power. The government's response proves the point. It posits (Opp. 24) that in rewriting the Medicare statute, the Secretary must try to reduce program expenditures, enhance the quality of care, or both. But since saving costs and lives are *always* the two leading purposes of healthcare laws, the government's proposed "intelligible principle" amounts to little more than an instruction from Congress to "legislate better than us."

Given its interpretation of Section 1115A's judicial-review bar, the government effectively argues that CMS could waive the entire Medicare statute and then issue an indefinite, nationwide, and mandatory rule establishing a new scheme entirely of its own creation, all without any court ever having the ability to review it. That cannot possibly be the law.

## CONCLUSION

Plaintiffs' TRO Motion should be granted, the MFN Rule should be temporarily enjoined pending resolution of the Motion for a Preliminary Injunction, and a briefing schedule should be set allowing the Court to resolve that Motion before the Rule goes into effect.[3]

---

[3] The government objects to "nationwide relief," but fails to explain how a TRO could be tailored to be "no broader than necessary to provide Plaintiffs relief." Opp. 35. Such an approach is also at odds with the government's insistence elsewhere that "it [is] important for the MFN Model to be tested on a nationwide scale." Opp. 4. A TRO that applies to some patients, providers, and manufacturers but not others thus would be unworkable even under the government's own theory.

DATED:  December 16, 2020

Respectfully submitted,

Michele Sartori (Bar No. 26829)
E. Elizabeth Halpern****
Susan M. Cook****
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
michele.sartori@hoganlovells.com
elizabeth.halpern@hoganlovells.com
susan.cook@hoganlovells.com

*Counsel for Plaintiff Association of Community Cancer Centers*

Andrew Zimmitti (Bar No. 18539)
Michael Kolber*
Adam Finkelstein****
MANATT, PHELPS & PHILLIPS LLP
1050 Connecticut Avenue, NW, Suite 600
Washington, DC 20036
(202) 585-6505
azimmitti@manatt.com
mkolber@manatt.com

*Counsel for Plaintiff Global Colon Cancer Association*

*/s/ John P. Elwood*
John P. Elwood*
Jeffrey L. Handwerker***
R. Stanton Jones (Bar No. 20690)
Allon Kedem*
Diana Sterk*
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000
john.elwood@arnoldporter.com
jeffrey.handwerker@arnoldporter.com
stanton.jones@arnoldporter.com
allon.kedem@arnoldporter.com
diana.sterk@arnoldporter.com

*Counsel for Plaintiff Pharmaceutical Research and Manufacturers of America*

Timothy Cleveland*
Alethea Anne Swift*
CLEVELAND | TERRAZAS PLLC
303 Camp Craft Rd., Suite 325
Austin, TX 78746
(512) 689-8698
tcleveland@clevelandterrazas.com
aswift@clevelandterrazas.com

Benjamin H. Carney (Bar No. 27984)
GORDON, WOLF & CARNEY, CHTD.
100 W. Pennsylvania Avenue, Suite 100
Towson, MD 21204
(410) 825-2300
bcarney@gwcfirm.com

*Counsel for Plaintiff National Infusion Center Association*

*\* Pro hac vice*
\*\* *Pro hac vice* application forthcoming
\*\*\* Application for admission forthcoming
\*\*\*\* Application for admission pending

**CERTIFICATE OF SERVICE**

I hereby certify that this document will be served on Defendants in accordance with Fed.

R. Civ. P. 5. I further certify that a courtesy copy of this Reply in Support of Plaintiffs' Motion for

a Temporary Restraining Order and accompanying exhibits will be sent to the Court via third-party

commercial carrier.

*/s/ John P. Elwood*
John P. Elwood
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C., 20001
(202) 942-5000
john.elwood@arnoldporter.com

*Counsel for Plaintiff Pharmaceutical Research and
Manufacturers of America*